THE MISSOURI PACIFIC RAILWAY COMPANY v. LEANDER FINLEY.

1. CASE, *Followed.*    *Patee v. Adams*, 37 Kas. 133, followed.

2. TEXAS-CATTLE LAW—*Police Regulation*—*Valid Statute.* The statute enacted for the protection of cattle against contagious diseases, (Laws of 1881, ch. 161; 1883, ch. 145; 1884, ch. 3,) having for its object the protection of the cattle of the state from the disease known as Texas, splenic or Spanish fever, is justified as a police regulation, and therefore is not in contravention of any provision of the constitution of the United States.

3. DISEASED CATTLE — *Duty of Railway Company as Carrier — Liability.* Where a railway company, transporting through this state upon a train of cars, cattle diseased with the Texas, splenic or Spanish fever, has its train wrecked within the state so as to make it necessary to unload the cattle, and thereupon is notified that the cattle are from Texas, and will spread disease among the domestic cattle if permitted to run at large or if driven upon the public highway, it should corral the cattle at or near the wreck, or otherwise prevent them from running at large or getting upon the public highway, until reloaded; if, however, it drives the cattle, after receiving notice of their diseased condition, upon the public highway, it does so at its own peril and is liable, under the statute, for the damages arising by the communication of the disease or fever to domestic cattle from the cattle so diseased, provided the owners of the domestic cattle are not guilty of contributory negligence.

4. NOTICE TO EMPLOYÉS, *Notice to Company.* The officers and employés of a train of cars, having the sole charge and control of the cargo or freight thereof, are, *pro hac vice*, vested with the power and authority of the corporation; and notice to such parties, in sole charge and control of the cargo or freight, concerning matters connected therewith, must be considered as notice to the corporation.

5. EXPERT — *Who is Not.* Where a person has been educated in a particular profession, as a physician, surgeon, or veterinarian, he is presumed to understand thoroughly the questions pertaining to his profession; but a person not a member of these professions, who has read extensively from books and heard the testimony of experts in court in regard to the diseases of men or cattle, is not considered an expert concerning the same.

6. REPLY, *Not Verified — Practice.* Where the petition alleges that the railway company drove certain Texas cattle from a wrecked train along and upon the public highway and the answer states that after the wreck "the cattle were taken from the cars by the owner, who thereupon appointed agents, who drove the cattle, under his authority and direction, to the next station," the issue upon the pleadings is, whether the railway company through its agents and employés drove the cattle, or whether the owner, by his agents, took charge of the cattle and drove them; therefore the failure to verify the reply did not admit that the owner took charge of the cattle and drove them away.

*Error from Brown District Court.*

ON April 21, 1885, *Leander Finley* filed his petition against *The Missouri Pacific Railway Company,* and therein alleged that the said defendant is, and for more than two years last past has been, a railroad corporation duly organized and doing

business in the state of Kansas; that during the whole of the year 1884, the said defendant was, ever since has been, and still is engaged in operating a railroad running from the city of Atchison, in Atchison county, Kansas, into and through the county of Brown, in said state, and so on to Omaha in the state of Nebraska, known as the Missouri Pacific Railroad, and in so doing was during all that time, ever since has been, and still is a common carrier of freight and passengers on said railroad, and as such, on or about the 9th day of May, 1884, the said defendant ran a train of its cars over its road into said Brown county, in which said train of cars there was being transported as freight by the defendant as a common carrier, about one hundred head of Texas cattle of wild and undomesticated habits, and which said cattle were diseased with a disease known as "Texas, splenic or Spanish fever;" that the defendant knew that said cattle were Texas cattle, and that they were of wild and undomesticated habits, and that they were diseased with a disease known as Texas, splenic or Spanish fever, and that said Texas cattle, as the fact is, would communicate said disease to all cattle in this state that passed over the ground on which said Texas cattle passed; that when said train of cars reached a point on said railroad in said Brown county, about two and one-half miles northwest from a station on said railroad called Baker, in said Brown county, the train on which said cattle were taken into Brown county, and on which they were as aforesaid being transported by the defendant through said Brown county, was wrecked, and said cars in which said cattle were, thrown from the track of said defendant's railroad, and were by said defendant and its servants unloaded, and let out of said cars; that the owner of said cattle was on said train, and notified said defendant that said cattle were through cattle and Texas cattle, meaning thereby, which the defendant knew, and so understood, that they were Texas cattle and were so as aforesaid diseased, and that the persons there present requested the defendant and its agents, servants and employés to reload said cattle at the same place where they were so as aforesaid unloaded, and not to drive them to any

station; but the defendant, notwithstanding such notice and said request, wrongfully and unlawfully drove said cattle from the place last aforesaid along and upon the highway to Hiawatha, in said county, over a portion of the territory of Brown county aforesaid, and reloaded said diseased cattle at Hiawatha aforesaid; that at said time and for several months afterward, this plaintiff was the owner of a large number of domestic cattle, and that without the fault of the plaintiff, the said diseased cattle communicated the said disease of Texas, splenic or Spanish fever to plaintiff's said domestic cattle, and infected plaintiff's said domestic cattle with the said disease of Texas, splenic or Spanish fever, and in consequence thereof a large number of plaintiff's said cattle which were of high grade and of great value, to wit, twelve head, some being with calf, and of the value of nine hundred dollars, died and were injured; that the plaintiff spent two months of valuable time, worth one hundred dollars, and large sums of money for medicine, to wit, the sum of fifty dollars, in endeavoring to cure his said cattle of said disease so as aforesaid communicated to his said cattle, and the plaintiff has sustained damages in consequence thereof in the sum of ten hundred and fifty dollars, for which he demands judgment against the defendant, together with the costs of this suit.

On May 17th, 1886, the railway company filed the following amended answer herein:

"1. That it denies each and every allegation, statement and averment therein contained.

"2. For further answer this defendant says, that said cattle were being transported by the defendant as a common carrier through the states of Missouri and Kansas into the state of Nebraska, for and under the orders and directions of the owners of said cattle; that while in the county of Brown, without fault of defendant, defendant's cars were derailed, and said cattle were taken from the cars of defendant by the owner of said cattle, and by him taken charge of, and he thereupon appointed agents to take charge of said cattle, who under his direction and under his authority drove said cattle to the next station; that all of the persons then in charge of said cattle were the agents and employés of the owner of said cattle, and

were acting under his appointment and authority, and this defendant did not drive or permit or authorize to be driven into or through said county, any of said cattle. Wherefore, defendant demands judgment for costs."

On May 17, 1886, Finley filed his reply, denying every allegation contained in the answer inconsistent with the averments of the petition. Trial commenced May 17, 1886, before the court with a jury. The jury returned a general verdict for the plaintiff, and assessed his damages at eight hundred and eighty dollars. Subsequently the railway company filed its motion for judgment on the findings of fact, the general verdict to the contrary notwithstanding. This motion was overruled. On May 19, 1886, the defendant filed its motion for a new trial. This motion was also overruled. Thereupon the court rendered judgment upon the verdict of the jury in favor of the plaintiff and against the defendant for eight hundred and eighty dollars, and for all costs.

The railway company excepted, and brings the case here.

*Waggener, Martin & Orr*, for plaintiff in error.

*W. D. Webb*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: The facts in this case as disclosed upon the trial are substantially as follows: On and prior to May 9, 1884, the Missouri Pacific Railway Company was running and operating a railroad from the city of St. Louis, Missouri, through the states of Missouri, Kansas, and Nebraska; on the 9th day of May, 1884, it was carrying on its road from Missouri through Kansas to Nebraska, from fifteen to eighteen cars of Texas cattle — one hundred head — which had been shipped by the owner over the railway, who was upon the train in which they were being transported. On said May 9, while the cattle were in transit through Brown county, in this state, three to five cars of the cattle were derailed and wrecked; many of the cattle were injured and killed, and it was necessary to remove the cattle from the train; the cattle could not

be reloaded at the wreck without first building a corral and cattle-chute and obtaining additional cars; the wreck was of such a character as to block up the road for several hours and prevent the passage of trains; the cattle were driven from the wreck along the public highway to Hiawatha, about seven miles, where they were reloaded into cars and taken to Nebraska; Hiawatha was the next station on the line of railroad north of the wreck; Finley resided at the time two miles south and west of Hiawatha, upon a farm owned by him, a mile and a half from the Missouri Pacific Railway; as the cattle were being driven to Hiawatha, one of them escaped and got into his pasture; he saw the animal the same day among his cattle; he recognized the animal as one of the breed commonly called Texas, or Southern; he kept the animal, and permitted it to run with his other cattle for about two months; he had had considerable experience with cattle up to this time, as he had been in the stock and cattle business four or five years; he however did not discover any disease in the animal, and has since retained the animal in his possession. In July, after the cattle were driven from the wreck to Hiawatha, several of Finley's became diseased with splenic or Spanish fever; twelve head died of this disease, and their value was eight hundred and twenty dollars.

Finley brought this action against the railway company to recover the sum of ten hundred and fifty dollars. The jury returned a general verdict in his favor for eight hundred and eighty dollars, and judgment was entered thereon against the company. This action seems to have been brought and tried under the statute enacted for the protection of cattle against contagious diseases. (Laws of 1881, ch. 161; Laws of 1884, ch. 3.) The transactions complained of occurred in 1884, therefore prior to the legislation of 1885. (Laws of 1885, ch. 191, § 5.)

The first contention of the railway company is, that the statute referred to cannot apply, as the same tends to place an embargo upon interstate commerce, and *Railway Co. v. Husen*, 95 U. S. 465, is cited as decisive. In that case, a statute of

Missouri, prohibiting Texas, Mexican or Indian cattle from being driven or conveyed into the state between the first day of March and the first day of November in each year, was deemed to be an unlawful exercise of police power. It was, however, conceded in that case that the general police power of a state would "justify the exclusion of property dangerous to the property of citizens of the state; for example, animals having contagious or infectious diseases; all these exertions of power are in immediate connection with the protection of persons and property against noxious acts of other persons, or such a use of property as is injurious to the property of others. They are self-defensive." The Missouri statute interposed a direct prohibition against the introduction into the state of Missouri of certain classes of cattle during eight months of each year without any distinction, whether they were diseased or not. In this state, the statute interposes its direct prohibition against the introduction of cattle into the state diseased with the Texas, splenic or Spanish fever. In this case, Dr. A. A. Holcombe, the state veterinarian, testified that the Texas, splenic or Spanish fever may be communicated to native cattle from cattle coming immediately from the low grounds that border the gulf of Mexico; that the area of the infected districts includes half of Texas, a portion of the Indian territory, two-thirds of Arkansas, and other territory; that Texas, or other herds coming from this territory have an abnormally high temperature; that the opinion is very generally entertained that the cattle capable of transmitting the Texas, splenic or Spanish fever emit a peculiar odor; but that herds from the infected districts without odor are also capable of transmitting the disease; that native cattle are usually infected from grazing or passing over the trail of cattle capable of transmitting this disease; also from passing along railroad tracks over which these cattle have been transported in cars; that native cattle will also become infected with the disease by being carried in cars which have previously been used in transporting Texas or southern cattle from the infected districts; that it is generally safe to bring Texas cattle, so diseased, into

the state during the months of December, January and February; that the reason that the Texas cattle do not communicate the disease in those months is, that the low temperature destroys the virus of the disease.

In the case of *The State of Kansas v. Mugler*, 25 Rep. 1, decided by the supreme court of the United States, that court said:

"Property, under our form of government, is subject to the obligation that it shall not be used so as to injuriously affect the rights of the community. . . . It belongs to the legislative branch of the government to exert what are known as police powers of the state, and to determine primarily what measures are appropriate, or needful, for the protection of the public morals, the public health, or the public safety."

The decision is only the recognition of the doctrine that the police power of the state extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the state. We have construed the acts upon which the alleged liability is founded in this case, so that no recovery can be had against any person or corporation acting in good faith, unless such person or corporation had knowledge, or such facts existed as to make the person or corporation chargeable with knowledge, that the cattle driven or transported into the state were diseased, or were of a kind liable to communicate disease to the domestic cattle of the state. (*Patee v. Adams*, 37 Kas. 133.) As thus construed, we do not think the statute of the state an intrusion upon the exclusive domain of congress. And we think that the statute, aided by the testimony of the nature of Texas, splenic or Spanish fever, and the peculiarities of Texas or southern cattle so diseased, against which this legislation is directed, has for its substantial object the protection of the property of the citizens of the state, and therefore ought to be sustained. Clearly, the object of this statute is not to obstruct interstate commerce, but solely to exclude from the state cattle having contagious or infectious diseases, and therefore wholly for the immediate protection of the property of this state against the noxious acts of other persons, or such a use of

1. Case, followed.

their property as is dangerous and injurious to the cattle interests of this state.   If this law is not constitutional and within the police power of the state, then the state is absolutely powerless to protect the property of its citizens.   If this and similar statutes are in conflict with the constitution of the United States, the state is wholly disarmed and defenseless to exclude property from the state that is dangerous and injurious to the property of its citizens.   We think the statute can be fully justified as the legitimate exercise of the police power of the state; and that it is not usurpation of the power vested exclusively in congress.   It is founded upon the law of self-defense.   Among other things, the court instructed the jury as follows:

2. Texas-cattle law — police regulations — valid statute.

"3. The burden of proof in this action is upon the plaintiff, and in order to recover, it is necessary for plaintiff to prove by a preponderance of evidence the existence of each and all of the following facts: First, that in said county of Brown, on or about the 9th day of May, 1884, said defendant, as a common carrier, was transporting as freight in its cars upon its railroad about one hundred head of Texas cattle; second, that said cattle were diseased with a disease known as Texas, splenic or Spanish fever; third, that at a point on said railroad in said county of Brown, the said cattle, at the time mentioned, were unloaded from the cars of the defendant, and by said defendant were driven along the highway over a portion of the territory of Brown county; fourth, that at said time and afterward, the plaintiff was the owner of a number of domestic cattle in said county; fifth, that without fault of plaintiff and in consequence of said cattle being driven through said territory the said disease of Texas, splenic or Spanish fever was communicated to the cattle of plaintiff; sixth, that by reason of said disease being so communicated to his said cattle, plaintiff sustained loss and damages."

It is further contended that these instructions were in substance that a recovery could be had against the company, although it acted in the best of faith and had no knowledge that the cattle it was transporting were diseased; and although no fact existed as to make it chargeable with knowledge that the cattle were diseased, or were of a kind liable to communicate disease.   This objection seems to be well taken.   The

court did not take the correct view of the statute. There was no proof before the jury that the cattle were of wild and undomesticated habits; or that the railway company loaded the cattle upon its cars at any point south of the thirty-seventh parallel of north latitude; or that the railway company, before the derailment of its train in Brown county, had any knowledge that the cattle were diseased, or were liable to communicate disease to domestic cattle. After a careful reëxamination of the question, we are satisfied with the construction given to the statute in *Patee v. Adams;* and upon another trial the district court will follow that construction. That statute does not in terms dispense with the necessity of averring and proving the knowledge of the person or corporation attempted to be brought under its terms. If the railway company was notified, soon after the cattle were unloaded from the wrecked train, that they were Texas cattle and liable to spread disease among domestic cattle, then it became its duty to use precautionary measures to prevent any damage by the communication of disease from the cattle under its charge. Upon such notice, if any was given, the statute had operation. (Laws of 1881, ch. 161; Laws of 1883, ch. 145; Laws of 1884, ch. 3.) If the company, after such notice, failed to reload the cattle at the wreck as demanded by the farmers there assembled, but instead drove them to Hiawatha, it did so at its peril, and is liable for damages arising by the communication of disease from the cattle so driven, provided Finley was not guilty of contributory negligence. The company might have corraled the cattle at or near the wreck, or otherwise prevented them from running at large or going upon the public highway until reloaded. (Laws of 1881, ch. 161, § 3; *Patee v. Adams,* supra.)

3. Diseased cattle — duty of railway company as carrier — liability.

It will be a question of fact in another trial for the jury to determine whether the railway company received notice soon after the wreck that the cattle were Texas cattle and liable to spread disease among native cattle. Counsel also insist that the railway company never had any notice of the diseased con-

dition of the cattle at the wreck, or subsequently. We think that if the road boss from Hiawatha, or the conductor of the train, or the trainmen, while in the actual posses-

*4. Notice to employes, notice to company.* sion and charge of the cattle in the line of their duty, had notice after the wreck, of their nativity and diseased condition, then notice to them would be notice to the company. As that fictitious entity, the corporation, can act only through natural persons, its officers and employés, and as it of necessity commits its trains absolutely to the charge of officers and employés of its own appointment, we think that the whole power and authority of the corporation, *pro hac vice*, is vested in the officers and employés; and that as to the cargo or freight of the train, they are to be considered as the corporation itself, when they are left in the sole charge and control thereof.

It is further claimed by counsel that under the pleadings, it is admitted that the owner of the cattle, as soon as the wreck occurred, appointed his own agents to take charge of them; and further, that the railway company is in no event liable, as it exercised no control or authority over the cattle after they left the cars. The allegations in the petition are that the railway company by its agents drove the cattle from the wreck along and upon the highway to Hiawatha. The answer alleges that after the cars were derailed and the cattle taken therefrom, the owner by his agents drove the cattle to the next station. The question upon this part of the pleadings is, which of the two sets of men drove the cattle—the agents of the railway company, or the agents of the owner?

*5. Reply, not verified—practice.* The failure to verify the reply does not admit that the owner took charge of the cattle and drove them along the public highway.

Upon the trial, C. W. Johnson, who testified that he was a lawyer by profession, and not a doctor, or veterinary surgeon, was allowed to give his opinion as to the symptoms and causes of Texas fever; and, also, was permitted to testify that the cattle communicating the Texas fever to domestic cattle in this state came from that part of Texas south of latitude thirty-

five. In order to determine whether the witness was competent as an expert, the following examination was had:

"Q. I will ask you if you have read a great deal upon the subject of Texas cattle? *Ans.:* Yes, sir.

"Q. And your information is principally derived from the knowledge you have derived from reading in regard to it? A. From books; yes, sir.

"Q. Some little observation? A. Yes, sir; from the testimony of experts, taken in a case in which I have been interested as a lawyer.

"Q. Case in court? A. Yes, sir.

"Q. The principal portion, if not all, is from knowledge derived from books and the testimony of experts in court? A. Yes, sir."

Upon this testimony, it does not appear to us that the witness possessed the legal qualifications of an expert. Where 5. Expert—who a person has been educated in a particular profesis not. sion as a physician, surgeon, or veterinarian, he is presumed to understand thoroughly the questions pertaining to his profession; but a person not a member of those professions, who has read extensively from books and heard the testimony of experts in court in regard to the diseases of men or cattle, is not considered an expert concerning the same. How far the discretion of the court goes in admitting expert testimony, we need not now decide. (*Commonwealth v. Sturtivant*, 117 Mass. 122; *Dole v. Johnson*, 50 N. H. 452.)

The judgment of the district court will be reversed, and the cause remanded for a new trial.

All the Justices concurring.