PROVIDENCE WASHINGTON INSURANCE COMPANY, Appellant, v. IOWA TELEPHONE COMPANY, Appellee.

**DAMAGES:** Speculative Damages—Element of Certainty—Proximate Cause—Negligence—Telegraphs and Telephones. Damages must be reasonably certain (a) in amount and (b) in respect to the cause from which they proceed, in order to be recoverable. Applied in case of delay by a telephone company in reporting an alarm of fire.

PRINCIPLE APPLIED: Action to recover *part* of the damages to an automobile from fire, because of the negligent delay of defendant telephone company in reporting an alarm of fire to the fire department. In filling the tank, the rear one, holding 25 gallons of gasoline, was overflowed and as much, possibly, as a gallon of gasoline was spilled on the floor, and took fire. The front tank, holding 10 gallons, was also open and a partially filled open can of gasoline sat on the floor. The alarm was 'phoned to defendant at 11:05 P. M., at which time the fire was burning under the rear of the car, but the car was not yet afire, though admittedly damaged to some extent. Later, the alarm was again 'phoned to defendant, at which time there was some wood smoke. "It was difficult to tell just when the wood smoke appeared." The garage was 5 feet longer than the car and hardly twice as wide, and was part of an old dry pine barn. Soft wood furniture crates filled with excelsior were piled along and close to the car. This caught fire after the second call was sent in. The defendant notified the fire department at 11:30 P. M.; the department was at the fire by 11:35 P. M. and extinguished the fire within 5 minutes. The department was ready at all times for service, with equipment in good order, including telephone connections. Plaintiff claimed that the damage up to the point of time *when the fire would have been put out,* had defendant promptly reported the alarm, was $231, and that the defendant's negligence was the proximate cause of all subsequent damages. *Held,* (a) the fire was the proximate cause of the damage, and (b) the computation of plaintiff's damages was pure speculation.

*Appeal from Scott District Court.*—HON. A. P. BARKER, Judge.

WEDNESDAY, NOVEMBER 24, 1915.

ACTION for damages against the defendant Telephone Company for alleged failure to deliver promptly a fire call to the fire department of the city of Davenport, whereby the plaintiff's assignor suffered a fire loss which might otherwise have been prevented. At the close of plaintiff's evidence, there was a directed verdict for the defendant. The plaintiff appeals.—*Affirmed.*

*Ely & Bush,* for appellant.

*Parker, Parrish & Miller* and *Cook & Balluff,* for appellee.

Evans, J.—The plaintiff is an insurance company, which had issued an insurance policy to one J. T. Haller against damage by fire to his automobile. The automobile was destroyed by fire. In pursuance of the policy, the plaintiff paid the loss to the amount of $2,750, and took an assignment from Haller of his alleged cause of action against the defendant for negligent delay in transmitting the fire call. The fire call reached the fire department at 11:30 P. M. The record of the telephone company shows also that this was the time of the receipt of the call from Haller. The claim of Haller, however, is that he sent in the call within a few minutes after 11 o'clock, and that there was a gross delay in transmitting the same. The following excerpts from his testimony will indicate the general nature of it:

"I live at 730 East Fourteenth Street and was living there June 23, 1913. I had a fire in the barn back of my house. Fourteenth Street runs east and west and I live on the north side of the street. The barn was north of the house. It faced to the south with the doors opening toward my house. . . . Five minutes or so after eleven o'clock, I first saw this fire. I didn't think it was more than 5 minutes after 11 at the time when I first saw it. It was under the rear end of the machine. I set down the can I had in my hand and jumped over the front end and got into the barn, went into the house and telephoned. I picked up the receiver; when I got a response, I told the girl there was a fire at Fourteenth and Grand Avenue. I took the receiver off and that called central automatically. Then someone at central answered and I told her there was a fire at my place at Fourteenth and Grand Avenue. She didn't say anything when I told her that, that I remember. Then I hung up the receiver and went out in the back yard and watched the fire. There was a fire under the back end of the machine, a kind of a bluish flame that hadn't taken hold of the automobile itself.

Then I waited quite awhile and walked out toward the front of the house and was listening for the fire bells.''

CROSS-EXAMINATION.

''I ran the auto into the barn from the driveway in the yard. It had double doors on the south side and was partitioned into one large room to the east and some box stalls and a large room toward the west. I used the west room for storage of the machine. It was about four or five feet longer than the machine and not quite twice as wide. The machine had a hundred and thirty inch wheel base and must have been fifteen or sixteen feet long and the room four or five feet longer than that. The front end of the machine was about as far north as it would go—drove it up to a lot of old crates in there. The gasoline storage tank was underground outside of the barn and the pipe from that storage tank came into the room where I kept the machine.

''Beside the double door, there was a small door toward the north end that communicated with the east half of the barn. There was no outside door except the double doors that I drove the machine through. I had been out to take a lady caller home. The machine was standing outdoors alongside the house and she had been calling on my wife and I took her home, running about five blocks in all.

''I did not pay particular attention to just what the hour was with any degree of exactness. When I returned I ran the machine into the barn and undertook to fill the tanks. The big tank at the rear of the machine held between twenty-five and thirty gallons. I used a kerosene tail light to fill the tank. I do not remember any other lamps burning. I filled the big tank so that it was full and overflowing. I got the gasoline from the storage tank, pumping it into a can like a large milk can, holding nine or ten gallons. I do not know that there was any gasoline spilled in pumping. When I filled the big tank, it filled quicker than I expected and ran over. I have no way to fix the amount spilled. I used a

specially constructed funnel that would hold a gallon and a half probably. I have no clear impression about how much gasoline there was in the funnel when it started to overflow. I don't remember whether it was the second or third can. I had put at least one can full into the tank. I think there was more than a quart that run over, maybe more than a gallon. What was left in the can I undertook to pour into an emergency tank under the seat holding not over ten gallons. My can was perhaps half full.

"I was standing on the sideboard, wedged between some old furniture crates and then I noticed that this became ignited on the floor under the machine. Whether I was in the act of pouring I do not remember.

"The funnel was in there. After the rear tank overflowed, I did not screw the cap on that. It was left open and the ten gallon tank under the seat was open with the funnel sticking in, as I remember it, and I had perhaps half a gallon of gasoline which I was either pouring or preparing to pour into the little tank, and at that time noticed a flame under the rear axle almost directly under the big tank. I knew there was forty or forty-five gallons of gasoline open there. I was interested in the can I had in my hand. It and the big tank on the rear and the little tank under the seat were all subject to ignition. I did not stop to investigate, but left. All I know of the flame under the rear of the car is that there was not enough flame to help me when I got into the other part of the barn where the box stalls were. There wasn't enough to illuminate the place to give me a chance to see where I was going. There was one door into the alley that I had never used and I tried to get out there, but that was locked; and there was a little passage way and a door near the house and it was dark in there and I could not see much, so there wasn't enough illumination near the machine to throw any rays of light into this other part of the barn. That was cut off by the partition, and there wasn't enough light came through the doorway to show me my way. There is a parti-

tion in the middle of the barn and I got over the front of the machine in some way and I finally got out of this little doorway which is shown on the picture at the south side of the barn. It was dark in there. It didn't take long for me to get out of the barn, but the door was closed and I could not see the light in the kitchen, I remember that, so I didn't know but what the door had been locked on the outside. I could not very well get out by the rear of the machine. This machine filled the doorway, it was just wide enough to allow this machine to go in there, was just a few inches on either side. It was filled up.

"I had been married less than a month or so and most of the furniture was shipped in crates, so alongside of this machine was a pile of crates with wrappings; so that was a narrow place and I had been on the side of the running board with these old crates standing there and pouring this way; so when I set my can down this way and the flame was there, I would have to get over that can in order to get out. If there had been no fire, I had room enough to pass alongside the machine and out the double doors and the reason I did not go that way was because of this can and the fire.

"After I got out the south door, I did not stop to size up the fire but ran right in the house and grabbed the telephone and got a response from central pretty promptly and told her there was a fire at Fourteenth and Grand Avenue. I don't know whether she switched over to the chief operator or not. I don't remember her saying anything about giving me the chief operator. I might say I am sure nothing was said about giving me the chief operator or I would have waited. Nothing was said about that. I don't know whether she made connections with the chief operator or not. There was no change in voices to my knowledge. All she did was to ask 'number' and then I proceeded to tell her there was a fire on Fourteenth and Grand Avenue. I don't think anyone asked me to repeat that,—I know they didn't. All I was interested in was giving them the location of the fire. I would

say that I was not connected with the chief operator. I don't know one operator from another. There was nothing to indicate whether that was done or not. After the first call I went out in the back yard.

"I know I had an indefinite impulse that if I had a garden hose I would turn it on, but our hydrant was in that part of the barn which was right alongside of the gasoline pump, so I didn't take any chances on going in there and connecting up any hose in the presence of that gasoline, and I did not know where the hose was.

"When I got back from telephoning the first time, the fire still seemed to be a clear blue flame from the gasoline. It was just under the rear end. There was nothing like wood smoke coming up from it when I got back from having telephoned, not much of a fire.

"It was an old barn, timbers were pretty dry. I don't know what kind of wood it was built of. It was an ordinary pine barn. Alongside the machine was crates that we had taken off from our furniture and those consisted of strips and pieces of soft wood nailed up open in the form of crates.

"All the excelsior and wrapping paper were piled in there. The fire reached that pile of crates and excelsior later on. After I went back from telephoning, the fire was still a clear flame which did not appear to have much wood smoke connected with it. I walked about the yard and I walked about the front and was trying to hear, listened for fire bells." Q. "Now, did you observe the fire any farther until you went back to the telephone the second time?" A. "Well, I was there all the while, up and down the yard between the barn and the sidewalk.

"The pile of crates and rubbish had not caught yet when I went back to turn in my second call.

"The flame was increasing and that prompted me to go in. This large tank which ran under the body of the machine had a big spout coming out. It must have been three and a half inches in diameter and that ignited and there was little

puffs of flame shooting out of there. I mean out of this tank that came from the rear, the lid of which was open and as I remember it, it puffed up a little bit a little while and would just shoot out and as that came out, it increased the fire and that prompted me to go in and telephone again.

"The flames were increasing and that is why I became anxious. It is pretty hard to remember when the wood smoke began to appear."

The fire company appeared upon the scene in 5 or 6 minutes after the alarm was turned in and extinguished the fire in about 5 minutes' time thereafter. The claim for the plaintiff is that, if the alarm had been promptly turned in by the telephone operator, the fire company would have appeared within 6 minutes thereafter and would have extinguished the fire within 5 minutes, and that the damage done to the automobile up to a point of time when the fire would have been extinguished was not more than $231, and that all the remaining damage was done by the continuance of the fire after such point of time. Evidence was introduced by plaintiff to show that the telephone connections of the fire department were in good order and that the machinery of the fire department was in good order and that the company was ready for service.

As authority for his right to recover upon the facts appearing in the testimony, plaintiff relies upon our recent case of *Volquardsen v. Iowa Telephone Company*, 148 Iowa 77. The defendant relies upon the same case

1. DAMAGES: speculative damages: element of certainty; proximate cause: negligence: telegraphs and telephones.

in support of the ruling of the trial court. It is not claimed by plaintiff that the decisive questions in that case were ruled in favor of his theory. He relies wholly upon certain distinctions made in the argument of the opinion and he claims to have introduced evidence to meet such distinctions and thereby to differentiate the present case from the *Volquardsen* case. The real obstacle in the way of

plaintiff's recovery in the case at bar, as well as in the *Volquardsen* case, is the remoteness of the alleged proximate cause and the speculative character of the extent or measure of damage.  These questions are discussed in the *Volquardsen* case and we need not repeat that discussion.  On those questions, there is no material distinction between the case at bar and the cited case.  Primarily, the proximate cause of the damage was the fire, for which the defendant had no responsibility.  Concededly, the automobile had already been damaged to some extent before the fire call was sent in to the defendant's operator.  The petition alleged that the extent of damage to the automobile, up to the time when the fire company should have arrived with proper diligence, was $216.  Under the evidence, it appears to have been $231.  This computation is predicated upon the claim that, up to that time, the combustion had been confined to the rear end of the machine, including the hind wheels.  This is assuming, of course, that the damage to such a mechanism as an automobile could be approximately measured by the degree of progress of the combustion of its parts.  Even if the extent of combustion were ascertainable at any given point of time with any degree of certainty, such an assumption as to the extent of the damage then actually done would be purely speculative.  Plaintiff, it is true, supports this contention with the testimony of opinion witnesses, who made their estimates as here stated.  But the fact that a witness lends his opinion to the record does not change the speculative character of the measure of damage claimed.  True, Haller described the fire as burning rather lazily for many minutes.  But it appears from his testimony that he had spilt probably a gallon of gasoline or more upon the floor.  The room was small, being nearly filled by the auto.  It included much inflammable material upon the floor, including furniture crates and excelsior.  The fire was under a 40-gallon gasoline tank, which was open at the mouth and overflowing.  The gasoline was necessarily evaporating.  The gas thus formed was burning.

There are some laws of nature so insistent and well-known that it is useless for expert or nonexpert to contradict them. A gasoline fire, under the circumstances depicted by Haller, is neither dilatory nor docile. When Haller first discovered it, he was unable to pass by it in order to go out the way he had come in. On the contrary, he was compelled to pass out at the further end into another room of the building, in order to escape.

The evidence for plaintiff was directed to an effort to prove the amount of increased damage inflicted upon the automobile after a supposed and indefinite point of time when the fire might or could have been extinguished, if the fire call had been prompt, and if, further, all subsequent efforts had been successful in result. Taking the evidence in this record, therefore, as it is, on the question of increased damage, we think it is purely speculative within the meaning of the law, and that no verdict could properly be based thereon.

The question of proximate cause is fully discussed in the opinion in the *Volquardsen* case, and we will omit a repetition of the discussion. We think that no such distinction is presented herein as to avoid the holding in that case. Following our holding therein, the judgment below must be affirmed.—*Affirmed.*

DEEMER, C. J., WEAVER and PRESTON, JJ., concur.