Lydia Peterson, Appellant, v. Martin Dolan, Appellee.

ANIMALS: Communicating Disease—Hog Cholera—Insufficiency of
Evidence.  Evidence reviewed, and held, in an action brougnt
by plaintiff, whose hogs contracted cholera after eating corn
bought from defendant, who had hog cholera on his place,
too uncertain and speculative to go to the jury upon the ques-
tion as to whether plaintiff's herd had been infected from de-
fendant's corn or through defendant's negligence.

*Appeal from Clinton District Court.*—Wm. Theophilus,
Judge.

July 3, 1919.

Action to recover damages. Appeal by plaintiff from
a directed verdict for defendant.—*Affirmed.*

*Pascal & Pascal,* for appellant.

*P. H. Judge* and *Wolfe & Wolfe,* for appellee.

Preston, J.—Plaintiff seeks to recover damages which
she claims to have sustained by reason of defendant's hav-
ing knowingly and wrongfully sold and delivered to her
corn infected with hog cholera germs, and having driven on
her premises with teams and wagons that were infected
with hog cholera germs, whereby her hogs became infected
with hog cholera, causing many to die, and others to become
sick, and depreciate in value.

The defendant in his answer admitted that he sold and
delivered to plaintiff corn from his farm, and admits that,
at the time of the said sale and delivery, he had hogs on
his farm that were afflicted with hog cholera, but says that
said hogs were never fed from the corn in the crib from
which the corn was sold and delivered to plaintiff, and that
said hogs were never closer to said crib than 100 yards.
Further answering, he says that neither while he was de-

livering said corn nor before, did he have any knowledge or information that hog cholera could be communicated to hogs by reason of the sale and delivery of corn from a pen that was not used for feeding, and that, if such corn would communicate the disease of hog cholera to the hogs of plaintiff, such fact was unknown to him, and that he had no means of discovering the facts, nor could he, in the exercise of ordinary care, or such care as was required of him under the circumstances, know that hog cholera would be communicated to hogs under the conditions stated; and says that it was, to his knowledge, the custom of all farmers who had hog cholera on their farms and who had corn to sell, to sell and deliver corn to anyone desirous of purchasing the same, and that he did not know or understand that the fact of thus selling or delivering corn would communicate hog cholera to hogs. Further, defendant denies specifically all allegations of the petition not admitted.

In reply, plaintiff alleged that, at the time she purchased the corn from defendant, and before delivery of the same to her, she inquired of defendant whether he had any hogs on his place sick with hog cholera, and informed defendant that, if he had any hogs so sick, she did not want to buy his corn, as it would communicate the disease to her hogs; and that defendant then and there falsely and fraudulently assured plaintiff that he had not then, and had not before said time had, any hogs on his place sick with cholera, when, in truth, he at that time had hogs so afflicted, and defendant's place was then under quarantine for said disease, as defendant well knew.

Defendant introduced no evidence, and there was no evidence of the custom alleged in his answer.

The errors assigned relate to the rulings on the admission and exclusion of evidence, and to the ruling on the motion to direct a verdict. As one of the errors assigned raises the question as to the sufficiency of the evidence to

take the case to the jury, it will be necessary to set out the more important parts of the testimony.

Witness Nicholsen, in the employ of plaintiff for 22 years, was instructed by her to purchase corn to feed her hogs. Witness says that he bought the corn of defendant; that he saw defendant about the 3rd or 4th of June, 1914. He says:

"I informed him I wanted the corn for feeding hogs and cattle; at the time I bought the corn, I did not have any information that there was any hog cholera there."

Just before the corn was delivered, and on the day it was delivered, witness had a conversation with defendant, and asked him if he had hog cholera on his place.

"The answer I got was, 'No; we are shoveling the corn, and it is on the road.' This was in the forenoon of June 15th. The day I went to see the corn before I purchased it, the corn was in the corn crib which was located west of his house. His yards are all around. It was a corn crib that he was using corn out of every day. That day, I saw hogs between 6 and 8 feet from this corn crib. The crib was not boarded up tight: there was about 1½ inch space between the boards. The crib was about 1½ feet from the ground. I commenced feeding this corn to plaintiff's hogs within a day or so after the corn was delivered. Between a week and two, 9 or 10 days after that, the disease broke out in Mrs. Peterson's hogs. About two weeks after that, Jerry Wolfe was called to look over her hogs. Five hogs had died then. Some of the hogs were vaccinated for hog cholera by Wolfe. Prior to the delivering of the corn by defendant, there were not any sick hogs of any kind on Mrs. Peterson's premises. There had never been any hog cholera there before. Q. Now had you brought onto the premises any hogs or cattle or produce of any kind from anywhere else except from Mr. Dolan's? (Objected to as incompetent, irrelevant, and immaterial. Objection sustained, and

exception from plaintiff.)   Q. Well, so far as you know, was there any other source of infection of Mrs. Peterson's hogs, other than that corn so brought there from Mr. Dolan's place?   (Objected to as incompetent, irrelevant, and immaterial; witness has not shown himself competent to tell where the hog cholera came from.   Objection sustained. Plaintiff excepts).   Q. I will ask you if, by reason of this diseased condition, the balance of the hogs were rendered of less value than they were before they were infected? (Objected to by the defense as leading, suggestive, and calling for an opinion and conclusion of the witness.   Objection sustained.   Plaintiff excepts.)   I asked the man that hauled the corn if there was any hog cholera there, and he said 'No.'   That was after about three loads had been unloaded."

Plaintiff testified that she had no knowledge that defendant had hog cholera on his place.

Jerry Wolfe, a regular graduate veterinary surgeon, and admitted to practice in the state of Iowa, says that he was acquainted with the fact that, in 1914, Mr. Dolan had hog cholera on his place.   He was placed under quarantine either the 15th or 17th of June.   Dr. Joenck had vaccinated the hogs and placed the quarantine.   He says:

"I was called to the premises of Mrs. Peterson the first time about August 14, 1914.   I found hog cholera there.   I placed the farm under quarantine on the 19th.   Hog cholera is a contagious disease; it is transmitted by germs.   We do not generally think it is carried on the corn.   We think wagons and things standing around hog yards become infected so they would transmit it to other yards.   It could be carried by horses' hoofs that would tramp through a hog yard that was infected and then go into another hog yard; it is one of the ways it is carried.   Q. Now, as a matter of fact, the germs from hog cholera are not contagious, but it is an infection; hogs have got to come in direct contact

with the disease germs? A. Yes, sir. Visiting neighbors carry hog droppings, etc., on their shoes, and are responsible for about 33 per cent of this disease being carried. Pigeons, hogs, or birds can carry the disease from one place to the other. Dogs traveling through can carry it. Q. Now, what is the chance of teams and wagon wheels carrying it for a distance of 5 or 6 miles over a road? A. I think it could be carried; the probability is that it would be carried. Q. In dry weather and dry roads for that distance? A. Yes, sir. As a rule, the profession do not know how it gets onto a place or where it starts from. I have been out in that country a number of times. Q. There are considerable pigeons and crows out there? A. Well, I haven't noticed that. I suppose there are. They are all over the country. Q. And also dogs running around there? A. Lots of them. Others had cholera at their places; but defendant's was, I suppose, a couple of miles nearer than the others. It is well known by the profession that birds that feed on the carcasses or from the droppings of hogs infected with the disease often carry it for some distance. Q. And about how soon after this corn was fed to these hogs, if it was carried, would the hog develop the disease? A. From 9 to 11 days. As a rule, dogs would carry it on their feet, the same as horses. Q. Now, these germs are very minute. If a speck as big as the head of a pin was carried off and dropped into a yard, it would infect the whole yard? A. It is supposed not to take much to do it. Q. If a corn crib was built with open slats, so that the dust and wind would blow in from the hog yard, or from the ground, throwing the dust of an infected hog yard there, would not that infect that corn and make that a means of carrying germs? A. It could be carried that way,—it could be,—of course, I would not be able to state whether it would or not. Q. After these quarantine cards are placed by you veterinarians that have charge of this disease, on a man's premises,

has he a right to haul out produce or other stuff of that kind and sell it to people before the quarantine is out? (Objected to by defendant as incompetent, immaterial, and irrelevant. Sustained. Plaintiff excepts.)"

Witness McClimon shelled the corn at defendant's, and knows of its being hauled to plaintiff's about June 18th; saw a few hogs around the crib in the morning, but they were not near the crib,—about 10 rods away; thinks there was a fence between the hogs and the crib, but could not say; does not remember how he drove in and out of the yard where the hogs were.

"I do not know how they hauled the corn out. It was just a common barnyard around the crib. I do not know whether it was a hog yard or not. The crib was between where I saw the hogs and the road. I don't think that, going from the corn crib out to the road, they went through where the hogs were."

The motion to direct a verdict was in the following form:

"First. It nowhere appears from the evidence that any hog cholera germs were distributed by the corn or contributed to the hog cholera that affected the hogs of the plaintiff.

"Second. From the evidence, it appears that the germs of hog cholera are carried by various sources, including dogs and birds and animals, and there is nothing to show or would warrant the jury in finding that any germs were contained in the corn that was sold by the defendant to the plaintiff.

"Third. It appears affirmatively from the evidence that, if this corn had the hog cholera germs, that it would have communicated the same to the hogs within 9 or 10 days from the feeding of the corn; and it affirmatively appears from the evidence in this case that this corn was fed to the hogs on either the 15th or 18th of June, and the first call to the

veterinary was on the 14th of August following; and the testimony of the plaintiff's witness shows that he was called within 8 or 9 days after the first appearance of any sickness of the plaintiff's hogs.

"Fourth. It affirmatively appears from the plaintiff's evidence in this action that she herself knew, on the morning of the delivery of the corn, that the corn came from a farm that had the hog cholera on it, and that she is guilty of negligence in accepting and feeding said corn, and for that reason cannot recover in this action.

"Fifth. It affirmatively appears that about one third per cent of the hog cholera disease in the country is caused by birds, such as pigeons or crows, carrying the disease and distributing the same; and it appears from the evidence in this case that there were both pigeons and crows in this immediate neighborhood, and it would be only a guess on the part of the jury as to what caused the sickness of the plaintiff's hogs.

"Sixth. Giving to the testimony its greatest weight and consideration, there is nothing in the evidence that would justify or sustain a verdict of the jury in favor of the plaintiff in this action."

Appellant cites the following authorities, to show that the owner of stock is liable without regard to any statute prohibiting the introduction of diseased animals into another's herd: *Kimmish v. Ball*, 30 Fed. 759; *Conard v. Crowdson*, 75 Ill. App. 614; and *Missouri Pac. R. Co. v. Finley*, 38 Kan. 550 (16 Pac. 951), that a railway company which, after an accident, drives infected animals along a highway acts at its peril; and *Pike v. Eddy*, 53 Mo. App. 505; and 2 Cyc. 334, on the proposition that a railway company is liable for infection to stock produced by the unloading of infected manure from its cars; and to the same effect, 2 Cyc. 333; *Hite v. Blanford*, 45 Ill. 9; *Easton*

*v. Winnie,* 20 Mich. 156; Cooley on Torts (2d Ed.) 562, 563; *French v. Vining,* 102 Mass. 132.

Appellee cites no authority on these propositions, but their contention is that, where the facts are such as to leave it uncertain as to what caused the injury, there can be no recovery, citing *Neal v. Chicago, R. I. & P. R. Co.,* 129 Iowa 5; *Watt v. Robbins,* 160 Iowa 587; *Bump v. Augustine,* (Iowa) 154 N. W. 782 (not officially reported) ; *Providence Wash. Ins. Co. v. Iowa Tel. Co.,* 172 Iowa 597; *Ashcraft v. Davenport Loc. Works,* 148 Iowa 420; and other cases.

Quoting from some of the cases, and stating the rule briefly, it is that, if the circumstances surrounding the case do no more than indicate a possibility of the accident's happening because of a defective appliance, or if they are no more consistent with the theory that the accident was due to some defect than with some other theory than the one charged, then plaintiff has not made out his case.

The decisive question presented for our consideration is whether the evidence was sufficient to carry the case to the jury. The members of the court are divided in opinion on that question. Some of us, including the writer hereof, think the evidence sufficient to go to the jury. The majority view, however, is that the evidence is too uncertain and speculative to justify a submission to the jury thereon.

Rulings on objections to evidence are complained of; but, in the view we take of the case, these would not change the result. The order of the trial court is, therefore,—*Affirmed.*