JOHN O. BOMGREN, Appellant, v. EDWARD HANISH, Appellee.

**NEGLIGENCE:** Acts Constituting—Failure to Destroy Diseased Car-
1   cass.   Evidence reviewed, and held quite insufficient to show whether
    certain hogs had died of hog cholera, swine plague, or other disease.

**EVIDENCE:**   Weight and Sufficiency—Conclusiveness on Party In-
2   troducing.   A party is bound by his own testimony, in so far as it
    stands uncontradicted.

**ANIMALS:**   Communicating Disease—Evidence.   Evidence reviewed,
3   and *held* that the failure to destroy the carcasses of certain dead
    hogs was not shown to be the proximate cause of the infection of
    plaintiff's herd.

*Appeal from Pocahontas District Court.*—D. F. COYLE, Judge.

DECEMBER 15, 1922.

ACTION to recover damages for the loss of hogs. Plaintiff claims that his hogs contracted a disease from the carcasses of the hogs of the defendant which had died of said disease, which hogs defendant had negligently failed to burn. The facts appear in the opinion.—*Affirmed*.

*Whitney & Whitney,* for appellant.

*F. C. Gilchrist,* for appellee.

ARTHUR, J.—I. The defendant is the owner of a certain farm in Pocahontas County, Iowa, upon which he resided prior to March 1, 1920. In 1919, he leased said farm to the plaintiff

**1. NEGLIGENCE:**
**acts constitut-**
**ing: failure to**
**destroy diseased**
**carcass.**

for a term commencing March 1, 1920, and plaintiff went in possession of said farm on or about said date. It is the plaintiff's contention that, during the summer of 1919, while the defendant was in possession of said farm, the defendant's hogs on said farm became infected with swine plague and died of said disease, and that defendant failed to properly burn the carcasses of said hogs. The plaintiff came on said farm about March 1, 1920, and placed on said premises a number of swine. It is his contention that his animals came in contact with the carcasses of the hogs of the defendant that had died on the said premises the previous year, and contracted the swine plague from said carcasses. Plaintiff sues for damages for the loss of his herd.

The answer admits possession of said premises, and defendant likewise admits that, prior to March 1, 1920, he kept on the premises a number of hogs, some of which had died of disease; and defendant alleges that plaintiff was guilty of contributory negligence.

At the close of the testimony for the plaintiff, the defendant moved for a directed verdict, and said motion was sustained. As the cause comes to us on appeal from the order sustaining the motion for directed verdict, it is necessary that we view the evidence in the light most favorable to the plaintiff.

The plaintiff called the defendant as a witness, and proved by him that he lived on the farm in question prior to March 1, 1920, when possession was given to the plaintiff, and that during said time he kept hogs on the said farm, and that 18 or 19 died of disease. In regard to the appearance of said hogs, the defendant testified:

"I first noticed there were one or two of them not doing as well as the rest of them. They coughed some,—a short dry cough,—this is the first I noticed. They got thin and weak after a time. They would wobble when they would walk. Their eyes seemed to be bloodshot some. Some of them discharged from the eyes. This was a kind of a watery discharge. I did not pay any attention to that exactly, but I know their eyes were inflamed, and there was some watery discharge—a kind of discharge. I could not say that that was true of all the hogs

that died there, but I think so, because all of their eyes were inflamed, I am sure; and later on,—I think it was the third day after the first one took sick,—I noticed they were throwing up their food. I also noticed that their dung was rather thin,—watery,—and that they got weak and would wobble when they walked, and that that was quite characteristic.''

The defendant also testified:

''I hauled my hogs that died to a place about 35 rods northeast of the barn, and left them in a depression, or ditch. I did not haul them out there just as they died. The last I took out was four of them. The rest had died before. I left them out there where the tile goes through. There was a depression there where the tile goes through.''

On cross-examination, the defendant testified as follows:

''The first that I hauled out was as soon as they died, and they all died in the space of 10 or 12 days. Six died in one week, and the others died the week afterwards. There were 18 that died altogether. At the time they died, I would drag them out with a rope. After the first had died, I took cobs down there and put those cobs right opposite the dead shoats, and put the dead shoats right on top of the cobs. Then I took some cobs and put them right over the six carcasses and poured kerosene over them and set them on fire and they burned up. They burned up almost entirely—the first six. Within four days, I think that I lost 10 or 11 of them. I took them out there and done the same. I piled cobs around them, poured kerosene over them, and set them on fire. I took some hay down at the same time, hay and straw, and put cobs over it and poured kerosene over it and set it on fire. About two days after that, I looked at the pile, and they were still smoking. I went down and looked at the pile,—that is, as I piled the last ones,—and I should judge the pile was about three to three and one-half feet high. There were four layers of hogs, laying one on top of the other, and that pile had gone down to just about the height of one of those shoats. It was much melted and burned down,—that is, when I looked at it the second time,—and it was still burning on one side. One of the heads had rolled off, and I put it back on the place where it was burning. There was not any hog that Mr. Whitney asked me about that I didn't haul out

to this place, and there was not a hog to which I did not apply the fire in the manner in which I have described. I know what happened to the carcasses of the dead hogs which Whitney asked me about this morning,—they burned up; and all, with the exception on the northwest side of the pile there were some skins left and part of the legs of some of the hogs by the east side, was all practically burned up, and I examined the skins that were left. I kicked at them with my foot, and they were hard. To my knowledge, I know that this fire burned,—I refer to the last fire after I hauled the last hogs out,—for two days, at least, as it was still burning two days after I set it afire. There was a blue smoke rising from the fire the second day after I set it on fire. If I remember right, the hogs were all burned, and nothing could be seen from the pile but a little black spot when the plaintiff was on my place finishing his plowing, and the hogs had been already burned.''

The plaintiff testified that he moved on the premises about March 1, 1920, and that his hogs were taken sick about the 20th of April. Previous to his moving on the farm, his hogs had been vaccinated for hog cholera. He testified that they were all well when he took them upon defendant's farm; that he cleaned out the pens and placed the hogs therein and left them in the hog house and yard until about the month of April, when he moved them to another yard. He let his hogs run in the pasture, containing 12 or 13 acres. Some time after he turned the hogs in the pasture, he noticed that they appeared ''greasy;'' and he testified that, on investigation, he found dead hogs in the pasture about 20 rods from the barn, and that there were 13 of such carcasses. He testified that these were all in the same condition as when the hogs died; that the flesh, skin, and hair were all there, and that they had not been covered up, and nothing had been done with them; and that there were no signs of any fire, and no indication that they had been burned. The plaintiff called a veterinarian, who examined his hogs, and who testified that he found them sick with hemorrhagic septicæmia, which is commonly known as ''swine plague.''

The veterinarian testified with regard to the difference between the symptoms of the diseases known as swine plague and hog cholera. The chief, if not practically the only, distinction

observable between the two diseases, as testified to by him, is with regard to the condition of the eyes of the sick animal. He said:

"In cholera, there is a gummy eye. When they come out in the morning, the lids will be practically gummed shut, and it will take them some little time to get them open. In swine plague, they have a watery discharge, and it isn't gummy. In cholera, it is what they call mucopurulent. In the swine plague, it is thin or watery. There is no gummy discharge there whatever."

It also appears from the testimony of the veterinarian that hog cholera and swine plague are distinct diseases, and that the vaccination of hogs for hog cholera is not a preventive of swine plague, and in no way renders hogs immune therefrom; that they are immune from hog cholera only.

In this connection, one of the questions raised by the motion for a directed verdict is whether or not the plaintiff was entitled to go to the jury on the question of plaintiff's hogs' having contracted said disease from dead hogs belonging to the defendant. Before the plaintiff was entitled to go to the jury on this question, it was incumbent upon him to furnish proof that the defendant's hogs died of the disease known as swine plague. If they died of hog cholera, or of some other disease than swine plague, then defendant could not be liable in any event.

The only evidence in the case that could have carried this question to the jury is the evidence of the defendant, who was called as a witness by the plaintiff, and who described the condition of his hogs. From this testimony, it is the claim of the plaintiff that there was sufficient evidence to go to the jury upon the question as to whether or not said hogs died from swine plague. The lower court held—and we think properly—that there was not sufficient evidence to take this question to the jury, or to sustain a verdict if one had been returned. No veterinarian or expert examined the defendant's hogs. No one testified as to the disease from which they died. Plaintiff's case at this point rests solely upon the testimony of the defendant, as a witness for plaintiff, in regard to the symptoms of the hogs which the defendant lost. Reduced to its last analysis, the

plaintiff's contention is that the defendant testified that his hogs that died on the premises the previous year had "a watery discharge from the eyes." The testimony of the veterinarian was that "a watery discharge from the eyes" is one of the symptoms of swine plague. He testified that in cases of hog cholera the discharge from the eyes is "gummy"—"what they call mucopurulent." Plaintiff argues that the jury would be warranted in finding from this evidence that the defendant's hogs died of swine plague.

We have set out in full the testimony of the defendant as a witness in behalf of the plaintiff, in regard to said matter. On this particular point, the defendant testified that "their eyes seemed to be bloodshot some. Some of them discharged from the eyes. This was a kind of watery discharge. I did not pay any attention to that exactly, but I know their eyes were inflamed, and there was some watery discharge—a kind of discharge. I could not say that that was true of all the hogs that died there, but I think so, because all of their eyes were inflamed."

There is no pretense that the defendant was in any way an expert in the diagnosis of the diseases of hogs. It is very evident that he did not attempt to make a nice differentiation between "a watery discharge from the eyes" and a "gummy" discharge, which, from the record, is the only distinguishing feature pointed out between the diseases of swine plague and hog cholera. Taking the evidence of this witness as a whole, we do not think it presented a question from which the jury would be justified in finding, as a matter of fact, that the defendant's hogs died of swine plague, rather than from hog cholera or some other disease. What the witness calls "a kind of watery discharge from the eyes" might, to the skilled veterinarian, be the "gummy discharge" characteristic of hog cholera, rather than the discharge characteristic of swine plague. It would of necessity, under the record, call for speculation and conjecture and surmise on the part of the jury, to determine the initial question in the case, to wit: whether the defendant's hogs died of swine plague or from some other disease. While absolute certainty is not required in a case of this kind, before a party is entitled to go to the jury, there must be some sub-

stantial evidence justifying the conclusion for which the party contends. Under the testimony of the veterinarian, if defendant's hogs died of hog cholera, the disease of swine plague could not be communicated to the plaintiff's hogs by coming in contact with the carcasses of defendant's hogs. Therefore, before plaintiff could recover, the jury would have had to find from the evidence that the defendant's hogs died of swine plague, rather than any other disease. No testimony whatever is offered from any source with regard to the symptoms of defendant's hogs, except that above quoted. Where the line of demarcation between the two diseases—swine plague and hog cholera—is as narrow and indefinite as it appears to be from the evidence in this case, we do not think the plaintiff was entitled to go to the jury upon this question, merely on the testimony of the defendant that the eyes of his hogs were inflamed, and some of them had "a kind of watery discharge," especially in view of his further testimony that he "did not pay any attention to that exactly."

Whether it was the discharge characteristic of swine plague or that of hog cholera is, under the evidence, a matter of conjecture and speculation, and we think that the evidence is not sufficient to carry this question to the jury.

II. The foregoing would be conclusive of plaintiff's right to recover in this action; for, if he failed to offer sufficient evidence to carry the case to the jury on the question that his hogs died of the same disease as did the defendant's hogs, this would remove the very foundation of his right to recover. But even if the plaintiff had been entitled, under the evidence, to go to the jury on the question of the identity of the diseases that affected the two herds of hogs, still the court was justified in directing a verdict on the ground of the failure of plaintiff to prove that any negligent or unlawful act on the part of the defendant was the proximate cause of the loss of plaintiff's hogs. Plaintiff's contention is that the defendant failed to burn the hogs that died on his premises, as he was required to do by Code Section 5015. He claims that the defendant left the carcasses of his dead hogs lying in a depression in the pasture on the farm, and that the plaintiff's hogs, coming in contact with the

2. EVIDENCE: weight and sufficiency: conclusiveness on party introducing.

carcasses of said hogs, contracted the disease from which they died. Plaintiff offered the defendant as a witness, and interrogated him in regard to this matter. We have set out in full the testimony of the defendant in regard to said matter, from which it appears that the defendant burned all of the hogs that had died upon the place while he was there, and that they were so burned that they were practically entirely destroyed. This testimony is binding on plaintiff, in so far as the same is uncontradicted. Plaintiff contends that this evidence is contradicted by the testimony of the plaintiff and others of his witnesses, who, in the spring of 1920, discovered the carcasses of hogs in the depression in the pasture referred to. The testimony of these witnesses is to the effect that the carcasses so discovered by them were in a whole condition, and that there was no evidence that the same had been burned in any manner. The defendant's hogs died in the fall, and were placed in the field in September or October. The carcasses found by the plaintiff and his witnesses were discovered in April following, and the evidence shows that they were in a comparatively good state of preservation, the carcasses being practically whole. In view of this long lapse of time, and our common knowledge of the action of the elements and the processes of decay and decomposition, we do not think that it can be said that the evidence of the plaintiff and his witnesses with regard to the hogs found in the pasture in April, 1920, fairly contradicted the evidence of the defendant, as a witness for plaintiff, that he burned the hogs that died on his place in the fall of 1919. Negligence and wrongdoing, especially the violation of a criminal statute, are not to be presumed. We think that the plaintiff's evidence as a whole was insufficient to go to the jury upon the question as to whether or not the hogs found by the plaintiff and his witnesses in the depression in the pasture, in the spring of 1920, were the hogs that defendant lost in the fall of 1919, or whether the defendant did not burn his hogs that died in the fall, as testified to by him.

The court did not err in directing a verdict for the defendant upon this phase of the case.

III.   The court was also warranted in directing the verdict for the defendant on the ground of the failure of proof to show

that the failure to destroy the carcasses of defendant's hogs, if he did so fail, was the proximate cause of the death of plaintiff's hogs. In other words, under the evidence in this case, it would have been a mere matter of speculation and conjecture as to whether or not plaintiff's hogs contracted the disease from the carcasses of defendant's hogs. The evidence in regard to the manner in which the disease of swine plague may be transmitted, very clearly shows that there were abundant and numerous sources of infection in the immediate vicinity where plaintiff's hogs were kept. The hogs on the farm immediately across the road were affected with and died from swine plague at about the same time. The hogs of other neighbors in that vicinity were likewise affected. The ravages of the disease were prevalent throughout that entire community. The evidence shows that the disease germs could be transmitted through the air, and are readily carried on the hoofs of horses, by dogs, turtle doves, crows, on the shoes of people, and in many other ways. The evidence in regard to this matter is strikingly similar to the testimony in the case of *Peterson v. Dolan,* 186 Iowa 848. The undisputed evidence shows that the plaintiff's hogs were allowed to run in such a manner that they might readily have come in contact with the infectious germs of swine plague from many other sources than the carcasses of defendant's hogs. While absolute certainty is not required in cases of this kind, and the plaintiff is entitled to all reasonable inferences that legitimately may be drawn from the proof offered, it is nevertheless true that a jury cannot be left wholly to speculation, surmise, and conjecture as to the probable cause of the injury complained of in an action of this character.

3. ANIMALS: communicating disease: evidence.

The court was justified in directing a verdict for the defendant on this ground. As bearing on the question, see *Peterson v. Dolan,* supra, and *Kutchera v. Graft,* 191 Iowa 1200.

IV. A question is raised on appeal with regard to the admissibility of certain evidence offered by the plaintiff which was rejected by the court on objection. No offer was made of the rejected testimony.

We have examined the rulings complained of, and find no error therein of which plaintiff can complain. On a careful

consideration of the case, we reach the conclusion that the action of the trial court in sustaining defendant's motion for directed verdict must be, and the same is,—*Affirmed.*

STEVENS, C. J., EVANS and FAVILLE, JJ., concur.