WESTINGHOUSE ELECTRIC & MFG. CO. v. DENVER TRAMWAY CO.

STENGER v. CITY AND COUNTY OF DENVER.

(District Court, D. Colorado. December 13, 1924.)

No. 7114.

1. Evidence ⬡⟹535—Expert witness must be shown to be specially qualified.

Before a witness can testify as an expert, it must be shown that he possesses the necessary qualifications; that on account of special knowledge, skill, or experience, possessed and enjoyed by him over others, his opinion on the subject of inquiry will aid the court or jury to a correct conclusion.

2. Evidence ⬡⟹543(1)—Economics student and writer held not qualified to testify as expert on valuation of street railway.

A writer and student of economics, public law, government, and sociology, holding degrees of Bachelor of Arts, Master of Arts, and Doctor of Philosophy, who was not an engineer, having never been employed by any street railway in any capacity, and having little experience in valuation of properties, held not shown to be qualified to testify as an expert as to

valuation of a street tramway system for rate-making purposes.

**3. Evidence ⟐584(1)—Nonexpert testimony of one not qualified as expert witness rejected, where inseparably affected by opinions of witness.**

Where a so-called expert on public utility matters was not qualified as an expert on valuation of street railways, his nonexpert testimony as to facts shown by tramway company's books should be rejected, where so modified, enlarged, or restricted by his personal opinion as to be inseparable from his opinion testimony.

**4. Carriers ⟐12(5)—Reproduction cost new, less depreciation, is dominant factor in valuation for rate-making purposes.**

In inquiry as to valuation of street railway system for the purpose of rate-making, ordinarily reproduction cost new, less depreciation, is the dominant factor, and of necessity must be the rule, where there are no other sufficient data on the subject.

**5. Evidence ⟐571(7)—Opinions of eminently qualified experts not to be lightly weighed.**

In the valuation of street railway property for the purpose of rate-making, opinions of experts who have given the subject long study and reflection, and whose continuous practical experience for many years have informed them on every phase of the inquiry, ought not to be lightly weighed though they need not be literally followed.

**6. Carriers ⟐12(7)—In valuation proceedings accrued depreciation is fact to be ascertained by inspection.**

In valuation of street railway for rate-making purposes, accrued depreciation is a fact to be determined by inspection.

**7. Evidence ⟐571(7)—Evidence held to require allowance of going concern value in rate-making proceedings.**

In proceedings for valuation of street railway by receiver for rate-making purposes, expert evidence on the question of value as going concern *held* to require allowance of lowest amount testified to; the municipality opposing increase in rates having offered no testimony on the question.

**8. Carriers ⟐12(5)—Easements in streets of street railway held property of value.**

Easements in streets, whatever their duration or terms may be, are property of value, indispensable to other property rights of street railway company, whether or not such value can be considered in fixing the base on which rates are to be established.

**9. Carriers ⟐12(1)—Constitutional law ⟐319—City has police power to regulate fares and service of street railway, but cannot fix confiscatory rates.**

City possesses at all times police power to regulate fares to be charged and character of services to be rendered by a street railway, so long as such regulations provide a fair return on capital investment and its preservation unimpaired; but to allow a public utility less is confiscation, in violation of constitutional guaranties.

**10. Street railroads ⟐28(2)—Ordinances held to grant easements in perpetuity.**

Ordinances granting easements and rights of way to street railway company, its successors and assigns, *held* to have granted such easements in perpetuity.

**11. Constitutional law ⟐205(7) — Perpetual easements to street railway held not violative of Constitution.**

Const. Colo. art. 2, § 11, prohibiting any irrevocable grant of special privileges, franchises, or immunities, *held* not applicable to the grant of perpetual easements in streets to street railway company; such easements being in furtherance of public right in the use of public highways.

**12. Street railroads ⟐28(2)—Perpetual easements grant not cut down by subsequent ordinances expressly reserving rights of both city and railway under prior ordinances.**

Perpetual easements in streets granted to street railway company were not surrendered or cut down to a lesser term by the passage of subsequent ordinances, limited as to term of grant, and their acceptance by the company, which were applicable only to extensions on specified streets, and which expressly reserved all rights of both city and street railway company under the earlier ordinances.

**13. Carriers ⟐12(5)—Value of street easements not included in rate-making base.**

Value of perpetual easements of street railway company in city streets cannot be included in valuation of company's property for rate-making purposes.

**14. Street railroads ⟐58—Receiver not permitted to renounce ordinance creating binding obligation.**

In proceedings by receiver of street railway company for permission to increase rates and to enjoin city from enforcing inadequate rates, receiver *held* not permitted to renounce ordinance, which required, as one of the considerations for its passage and acceptance, that the company pay to the city specified sum of money in monthly installments, which had theretofore been mutually performed, and had been construed as binding obligation on the railway to make all installment payments.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against the Denver Tramway Company. Petition by E. Stenger, as receiver of the Denver Tramway Company, to enjoin the City and County of Denver from enforcing rates fixed by ordinance. An order granting temporary injunction was affirmed by the Circuit Court of Appeals (277 F. 865), and thereafter a special master was appointed to take testimony. On exceptions to master's report. Exceptions sustained in part, and in part overruled.

See, also, 295 F. 809.

Gerald Hughes and H. S. Robertson, both of Denver, Colo., for receiver.

Rice W. Means and Harvey Riddell, both of Denver, Colo., for City and County of Denver.

LEWIS, Circuit Judge. This proceeding is on exceptions to the master's report. The reference came about in this way: The Denver Tramway Company was organized in March, 1914, became the owner of and has since operated a street-car system, largely within but in small part without the City of Denver. In acquiring the property it succeeded to the rights of predecessor companies. In December, 1920, this court on a creditor's bill appointed a receiver of all of its properties with power to continue operation. It had defaulted in payment of interest on a part of its mortgaged debt and in payment of taxes. It was indebted to unsecured creditors who were pressing for payment. This condition was brought about in large part by an increased wage scale which it had been compelled to pay for several years theretofore, increase in the cost of supplies necessary to operation, and because of a strike of its employés for higher wages during the summer of 1920. The strike was accompanied by mob violence, property of the company of large value was burned up and otherwise destroyed, and some of the new employés engaged to operate the cars, as well as some of those who participated in attacks upon them, were killed. Order was not restored and the street-car system again put in full operation until Government soldiers had been stationed in the City for several weeks as a means of protection. The company's credit was exhausted. The rate of fare which it was permitted to charge under a regulatory ordinance of 1919 was 6 cents for adults and half that amount for children. The City refused to increase the fares and the receivership followed.

In February, 1921, the receiver filed his petition in the creditor's suit alleging the facts that have been stated, that the wage scale of its employés had been increased approximately 100 per cent. over what it was prior to 1916, that conditions were such that they could not be decreased, that the Tramway Company had appealed to the City, its mayor and council to permit it to charge a 7-cent fare, which was refused, that the 6-cent fare which the City by ordinance permitted the company to charge, but not exceed, was confiscatory, and the receiver prayed that the City be enjoined from enforcing the 6-cent fare ordinance, that he be permitted to increase the fares to be charged to 10 cents for adults and 5 cents for children, as just and reasonable charges.

The City intervened and filed its answer to the receiver's petition. As a first defense it moved that the receiver's petition be dismissed, because the petition did not contain facts sufficient to constitute a cause of action in equity or at law, and because the court was without jurisdiction to grant the relief prayed. In its answer it also denied that the 6-cent fare was confiscatory, admitted that the City had refused to permit the company to charge more than six cents and alleged that Ordinances No. 3, Series of 1885, and No. 36 of 1888, granted to the predecessors and assignors of the Tramway Company, contractually fixed the fare at five cents, that the 6-cent ordinances later passed by the City Council were for temporary purposes and did not change the contractual obligations under the prior ordinances to charge not more than a 5-cent fare, and to which obligations the Tramway Company as assignee was contractually bound. The answer also set up the Ordinance of May 15, 1906, as restricting the company to charge not more than 5 cents for single passage to adults and half that amount for children. The contentions of the City concerning the Ordinances of 1885, 1888, and May, 1906, were resisted by the receiver. After hearing on the issue joined between the receiver and the City the court entered an interlocutory decree enjoining the City from enforcing or attempting to enforce a maximum fare of 6 cents for adults and 3 cents for children, and authorized the receiver to charge and collect fares not in excess of 8 cents for adults and 4 cents for children between the ages of 6 and 12 years, and to issue two tickets or tokens for adults for not more than 15 cents and four tickets or tokens for children for not more than 15 cents, after giving not less than 48 hours' notice of such change, and to cause to be issued to all passengers a receipt showing payments for fares in amounts in excess of 6 cents for adults and 3 for children, upon request of the passenger, and to keep record thereof. From this order the City appealed to the Circuit Court of Appeals, and that court affirmed the interlocutory decree of this court, as will be seen by its opinion in 277 F. 865.

Thereupon, for the purpose of final hearing and decree, the court appointed a special master to take and report the testimony, his findings of fact and such conclusions of law as he might deem essential to the proper advisement of the court. The master

heard the testimony, which consists of 6,500 typewritten pages; and also considered and returned with the testimony a large number of exhibits offered by each side, containing many hundred pages. After hearing arguments of counsel on each side he filed his report. He stated therein the values as he found them on the different classes of property composing the entire electric street railway system within the City belonging to the Tramway Company and reached the conclusion, which he announced in his report, that the 6-cent fare ordinance for adults and 3 cents for children was confiscatory and recommended to the court that the preliminary injunction against the enforcement of that ordinance be made permanent; subject, of course, to the City's police power of future regulation.

The system has about 200 miles of track within the City, street railway cars, an electrical power plant, electrical distribution system, shops and shop equipment, substations and substation equipment, lands and right of way, buildings and other needed property and structures in the operation of such plant. It has about 1,500 employés and owns and operates the only street-car lines within the city. It owns and operates two suburban lines of about 25 miles each, but they are not considered here and were not valued. The master filed his report June 25, 1924, and on July 14 following the receiver filed exceptions and objections thereto, 37 in all, challenging principally the findings of fact as to valuations made by the master, because, as claimed, those valuations are too low, are not sustained by the proof and are contrary thereto; and especially do the exceptions challenge the ruling of the master in permitting Delos F. Wilcox to testify as an expert witness.

There was no detailed inventory of the property composing the system until 1918. In that year the Tramway Company employed Mr. Frank P. Woy, a thoroughly competent and experienced engineer, to make up for it a complete inventory of all its property. This he did with the assistance of a large force, devoting several months to the work, the result of his labors being 30-odd volumes made up in permanent form; so that when the hearing came on before the master the Woy inventory was generally accepted as the true and correct inventory of the property making up the system, barring a few errors made by oversight, and subject to the exclusion of items that had passed out since the inventory was made, and the addition of new items that had been brought into the system since that time. The property that was taken over by the Denver Tramway Company from its immediate predecessor on its organization in 1914 had been projected and built up by many competing companies covering many years, as shown by the master's report. There had been horse-car lines, dummy-engine lines, cable lines, experimental electric lines that had come and failed and were taken over by some other company; and thus through a period of more than 30 years as the City grew in population the interests of the different companies did not become consolidated and unified in one until the present company's immediate predecessor brought that about some time around 1900. The record leaves the clear inference that the predecessor companies did not keep books in such way that from them investment costs of property in existence that had been acquired and installed prior to 1914 could be ascertained; and that continued under the present company until about 1916, when what is called the Work Order System was inaugurated. The Work Order Sytem as made up in the permanent files consists of loose leaves, one for each job, which shows cost of material and labor, and all incidentals of installation except overheads. The books of account did show property purchased and its cost but not the expense of installing it. That appears to have been covered by general account and not separable to different installations. On this subject the master says: "It is impossible to determine the actual investment cost of the property with any semblance of accuracy; and the witnesses found this situation to exist."

In 1918 the State Utilities Commission undertook to make a valuation of the property for rate purposes, and the Woy inventory was made for the hearing before that Commission. The Commission made a valuation and ordered an increase of the fares to seven cents, but the Supreme Court of the State held that the Commission had no jurisdiction over the subject. Woy's inventory classified the property in accordance with the Interstate Commerce Commission's system of accounting, and he placed valuations on the different classes of property, which, including overheads, in the aggregate amounted, according to Woy, to more than $30,000,000 valuation as of January 1, 1918. This he submitted to the Commission; and at the Commission's request he also submitted a valuation of $22,600,000 plus, based on average prices for a series of years prior to 1918. The Commission's engineers made

an examination and submitted lower estimates, also on average prices for preceding years. The Commission found a value of $20,867,750 for the City lines only, and it valued separately the two suburban lines at $2,806,350. Shortly after the State Utilities Commission made its finding in December, 1918, the mayor of the City of Denver called a Committee of 55 citizens from the principal civic, commercial and labor organizations of the City to investigate and value the properties af the Tramway Company and to make such recommendations as to fares and other matters that would aid in solving the street railway problem. That committee organized and employed Prof. Ketchum, Dean of the Department of Engineering of the State University, a competent and experienced engineer, who with assistants made a thorough examination of the exhibits and records presented to the State Utilities Commission and such independent investigation as he deemed necessary, and reported to the Committee of 55 his approval of the valuation made by the State Utilities Commission.

The receiver, to sustain his claim that the properties within the City were of a value of approximately $30,000,000, produced as witnesses Frank P. Woy and A. L. Drum, competent and experienced engineers. Mr. Woy graduated from the University of Wisconsin in 1903 with the decree of Bachelor of Science and Electrical Engineering. While there, he also took courses of study in mechanical and civil engineering, law and economics. Before his graduation he had done practical work in electrical engineering and construction. After his graduation and until 1906 he was employed by the firm of J. G. White & Co. of New York, on construction, installation supervision, operation, inspection and estimates on street railways and other electric power projects of importance in this country and in foreign countries, especially in the examination of actual construction work. That brought him in contact with various factories and sources of supply for material for railway systems. He quit the employ of White & Co. in 1906, but actively thereafter continued in the same line of work, serving companies with large investments in electrical plants, some operating street railways and others furnishing electrical power for various purposes. He installed some such plants and participated in making appraisals of public utility properties. He was employed by the Wisconsin Utilities Commission and by the City of Columbus, Georgia, for that purpose. He came

3 F.(2d)—19

to Denver on account of the condition of his health in 1910, but continued in the same line of work, representing electric light companies, electric power companies and electric railway companies in this territory. He had participated in making appraisals of public utility properties in many instances, the more important of which he gave, amounting in the aggregate in value to hundreds of millions of dollars. He was employed by the Denver Tramway Company in 1917 to make a complete inventory and valuation of its properties, which he did. During the later years, and at the time he testified, he was an instructor in the University of Wisconsin, delivering lectures on engineering, covering a course termed "Engineering Administration," which deals with the promotion, construction, operation, and regulation and all business and managerial matters having to do with utilities and industrial work.

Mr. Drum is consulting and constructing engineer of electric railways. He received his education in that line at the Massachusetts Institute of Technology, graduating in 1896 with the degree of Bachelor of Science and Electrical Engineering. Since that time he has been continuously and exclusively engaged in the line of his profession, constructing and operating electric railways and electric light properties, largely the former. He had had personal charge of construction of about 450 miles of track for eight or ten different electric railway systems, 175 miles for the Indiana Union Traction Company, and for other companies named with the mileage for each stated. For a time he had charge of operations for the Indiana Company, consisting of about 300 miles of track, and the entire system of which it was a part. For 9 years he was consulting engineer of the Philadelphia Rapid Transit Company. In that capacity he had served the Minneapolis and St. Paul Street Railway, the Chicago City Railway Company, the Cincinnati Traction Company, and had done special construction work for the United Railways of Baltimore, for the Dayton Street Railway System and for the Chicago Elevated lines. He and his organization had inventoried and appraised between 25 and 30 railway systems in the United States, aggregating more than 3,000 miles of track, consisting of 1,100 miles for the Chicago surface lines, 300 miles for the Cincinnati Traction Company, 160 miles for the Chicago elevated railroads, 425 miles for the Minneapolis and St. Paul Railway, and a number of other companies which he named throughout the country, aggregating in val-

ue many hundred million dollars. Mr. Drum reinventoried a very large part of the properties of the Denver Tramway Company, and both he and Mr. Woy made up exhibits introduced in evidence, classifying the properties of the company and placing valuations thereon as of December 31, 1922, to which they each testified as being reproduction cost new as of that date, less depreciation. They each made like valuations, as shown by exhibits which they made up, based on 3-year average cost immediately prior to that date, which were greater in amounts than the valuations which they made as of December 31, 1922. These valuations were of the properties of the Tramway Company lying within the city limits of Denver, except very short stretches of two lines over the limits and three converter stations without the limits. Mr. Woy's valuation, exclusive of cost of financing and going concern value, was $27,000,000 plus, and Mr. Drum's, exclusive of the same two items, was $26,000,000 plus. They pursued different methods. Mr. Woy seemed more exacting in detail and built up value from an ascertained unit cost. Mr. Drum seemed to treat the different classes of property in larger proportions or units for valuation purposes. They accepted valuations of lands on which the Tramway Company's buildings were situate and of small stretches of rights of way across private lots, made by witnesses residing at Denver who were competent to make such valuations. Each of them testified to the methods used in making up their valuations of the differenct classes of properties and each was cross-examined at length. There can be no doubt of the thorough competency of both Mr. Woy and Mr. Drum as expert witnesses on the value of the plant.

The City then, in answer to the valuations thus placed upon the properties by the two witnesses for the petitioner, called as a witness Delos F. Wilcox, known and referred to throughout this record as Dr. Wilcox. On account of a thesis which he prepared on the subject, "Municipal Government in Michigan and Ohio," Columbia University conferred on him the degree of Doctor of Philosophy. He also carries the self-assumed title of Public Utility Expert. He gave his occupation as that of Public Utility Expert doing consulting work in valuation rate cases, franchise controversies, rerouting and public policy. He graduated from the University of Michigan in 1894 with the degree of Bachelor of Arts, and in 1895 that institution conferred upon him the degree of Master of Arts. In his college work he made a special study of economics, public law, government and sociology. His doctor's degree was taken in constitutional law, administrative law and sociology. At the University of Michigan he also made a special study from records of the city government of Detroit, particularly from the point of view of charter forms of government. After his graduation from that institution he took special courses in Columbia University, chiefly in economics. After leaving Columbia he was engaged during the campaign of 1897, when the Greater New York Charter had been adopted and the first government of Greater New York was being established, in connection with the Citizens' Union of New York. He was secretary of the Press Committee for a time. After that he was secretary of the Municipal Association of Cleveland for a time, and while there made it his business to study the forms of city government, particularly in relation to public utilities. Later he was secretary of the Civic Club of Grand Rapids, and at that time examined all of the governmental activities and made checks of franchises and of the public utilities serving Grand Rapids. From there he went to Detroit in the same general work and made a more extended and detailed study of the street railway situation there, including the routing of cars and the history of the relations between the utility and the public. There he had nothing to do with valuation work, but in connection with his examination of the Detroit United Railways' policies and history he had to examine the valuation that had been made a few years before when Detroit was attempting to purchase the street railway.

In 1907, when the Public Utility Regulation plan was adopted in New York, the state was divided into two districts, one of them being New York City and the other the rest of the state. For each district a Public Service Commission was established and given regulatory powers over railroads, street railways and gas and electric light companies. The commission for the New York City district had, among its functions, the planning of new subways and the procuring of rights from property owners for the laying out of routes and negotiating contracts for the construction and operation of subways, and he became Chief of the Bureau of Franchises for that commission, which he held for 5½ years, until June, 1913. His particular work with the commission was to collect, analyze and index documents representing inter-corporate relations, making maps showing the rapid transit routes that

had been laid out, report to the commission on the matter of the companies' franchises, franchise rates in connection with rate capitalization, assist in the preparation of contracts for subway construction and operation, assist, chiefly through the giving of information and the preparation and furnishing of trackage maps, in the valuation work that was then being done relating to railroad and street railway lines. The subway construction which was planned and negotiated by the commission while he was connected with it came to a head in the so-called dual subway contracts which were executed in 1913, involving expenditure of about $4,000,000. That construction work is still going on. The witness was not a subway engineer and did not have charge, that is direct charge, of this construction work. The planning and the negotiating of the contract for this construction work was done while he was with the commission. On leave of absence from the commission he went to the Pacific Coast in the summer of 1912 and made a special study for the National Civic Federation of State and Local Regulation of Public Utilities. The Federation had established a special department to make a special investigation of that general subject because of the controversies that were then arising between state and local authorities with respect to theories and principles of regulation. He took in Minneapolis on the way back and subsequently made a somewhat elaborate report to the National Civic Federation. A committee for the Federation, in the compilation and preparation of a report which it made, used in part and rejected in part the report which the witness had made to the Federation.

After leaving the Public Service Commission in 1913 the witness was engaged in private practice for about a year along similar lines to those in which he was engaged when he testified, and then he became deputy commissioner of the Department of Water Supply, Gas and Electricity of the City of New York. The commissioner to whom he was deputy was given the right to regulate the rates of private water companies operating in the city. In the summer 1914 he was engaged as expert to supervise and make valuations of these private water properties for the commissioner and to assist and advise him in connection with the exercise of his powers for regulation. He was appointed deputy commissioner while that work was going on and retained that position until January, 1918. During that time, as deputy commissioner, he had general

charge, in the absence of the commissioner or through delegation of power from the commissioner, of the operation of the department. While such deputy commissioner he continued and completed the valuation of the Queens County Water Supply Company and on his recommendations rates were fixed. He made an elaborate report upon the value of the Citizens Water Supply Company. At the time he testified he was engaged by the City of New York as one of the experts on the City's side in the condemnation proceedings then pending for the determination of the value of that property. In addition to his valuation work above noted and in addition to the general administrative work carried on by him as deputy commissioner he made a special study of the problem of gas metering and a special study of the financial status of the department in which he was employed, that is, the Department of Water Supply, Gas and Electricity. After three years and four months with that department he has since engaged in private practice exclusively. A year or so previous to the giving of his testimony he was engaged by the Corporation Counsel of New York as one of the experts to represent the City in the controversy between the City and the Transit Commission which had been appointed by the City of New York to combine and reorganize all of the transit properties in New York City. The Transit Commission, through its Bureau of Valuation, submitted a complete valuation of all the properties as a basis for discussion and as a basis for the plan which the Commission had outlined, amounting to $465,000,000, and the work of the witness in that connection was to analyze, primarily, the operating statements of the street railway companies and to advise the special counsel who was retained by the City with respect to the plan of reorganization and the principles of valuation which had been used by the Commission. But the witness was so much away from New York and the City's opposition to the plan was so keen that he attended only the first valuation hearings, which never came to anything. He was also engaged to assist in the formulation of the "Service-at-Cost" franchise which went into effect in Montreal early in 1918. He was first called in to that by the Fare Franchise Committee, so-called, and appeared before the Montreal Tramways Commission to give testimony, if you may call it that, making an address and answering questions in relation to franchise and valuation policy. Later he was called in by the Commission itself in the matter of finally formu-

lating the contract, and he assisted in the preparation and drafting of the central features of the Service-at-Cost contract under which the Montreal Tramway Companies are now operating. He was called back to San Francisco to co-operate in the preparation of a charter amendment which would induce the United Railroads of San Francisco to build necessary extensions to take care of the World's Fair or San Francisco Exposition, which was coming on in a few years.

In 1917 he was called to Oakland, California, to give testimony before the Board of Arbitration in the San Francisco-Oakland Terminal Railway dispute between the company and the men and the general matter of public policy and the relationship between increase in wages and increase in fares, and some dispute as to whether a return on capital should take precedence over necessary operating expenses in the form of increased wages or otherwise. At that time he made quite an elaborate study of the wage conditions in street railway companies in the country and gave testimony before this Board of Arbitration. He was engaged to make a traffic study and routing study of the lines of the Virginia Railway & Power Company in the City of Norfolk. That involved a very careful study of routing and he made a report which was published by the company. He was also engaged by the Newark Evening Times, of Newark, New Jersey, to make a study and report on the terminal plans of the Public Service Corporation of New Jersey. The Public Service Corporation is the holding company and the Public Service Railway is the operating company. At that time the congestion at the point called Four Corners in the City of Newark was so great and the street facilities for moving street lines to other places were so meager that the company came forward with a plan of building a great street railway terminal on private property. It was in connection with the rerouting that would be necessary and the additional franchises that would have to be granted in order to enable the company to build the terminal that the witness made his study. He did not approve the project of building this extensive terminal. He thought a better method would be for the City to open up a few streets or widen a few streets. The City did not take action and the company went ahead and built the terminal. In the winter of 1918 he was called back to Newark to make a further study. While there the Public Service Railway Company applied to the State Board of Utility Commissioners for an increase of fares and he was retained by the State League of Municipalities as the chief expert for the municipalities in the rate proceeding that was instituted. That work was not based upon valuation during the emergency hearings, except that incidentally the valuation made by Dean Cooley of the Public Service Railway property was introduced at the request of the Commission. In the following year a permanent rate proceeding was started and the witness was then called in to represent the municipalities as chief expert in charge of the case, and he went through that proceeding, which involved several months of hearings before the Public Utilities Commission. He made no independent inventory and valuation in that proceeding because he had no time in which to make it, he was in court before he knew it, and the company's so-called Cooley Valuation, which was made two or three years before was introduced. His work as head or chief expert for the municipalities was to analyze the Cooley report and to present such facts as he was able to present in the time available with respect to the use of the property that was included that ought not to be included, and in respect to the theories of valuation applied to overheads as well as the theory of going value and so on. He and his associates made a complete study of the company's relations and the actual cost of the property as revealed by the company's books. His evidence and that of his associates was presented on that general basis. He arrived at a valuation by analysis of the valuation that was submitted primarily on behalf of the company, coupled with his and his associate's actual cost studies.

While he was working on that job the Federal Electric Railways Commission was appointed to study the electric railway problems of the country. The witness understood that that commission was appointed because of the special problems which had arisen in connection with street railway credits, street railway revenues and controversies over rates of fare, as well as the obligations of franchise contracts. The witness was asked to testify before that commission and he did so. He was then engaged by the commission to make an analysis of the record and of the testimony which had been presented, covering about 6,000 pages. He was engaged for about six months on that analysis and in the preparation of his report. After his report was completed the commission prepared and published its report in pamphlet form. The witness later published his own report

to the commission and entitled it: "Analysis of the Electric Railway Problem." He made a traffic and routing study in Bethlehem, Pennsylvania, with reference to handling the employés of the Bethlehem Steel Company and made a report thereon which was approved by the Chamber of Commerce. That city is situate on both sides of the Lehigh River, and the special problem was to get inter-communication between the two sides, which resulted in the planning of a so-called Hill-to-Hill bridge. The anticipated completion of this bridge raised a new problem in regard to routing the transit lines. Two years before the witness testified, he was called to Detroit by the mayor to advise with respect to the laying out of a municipal street railway system which was then being planned. Later he was called in by the Street Railway Commission of Detroit to analyze for them the new franchises that were submitted by the company. In 1919 the City of Cleveland called him in on an arbitration proceeding as a result of difficulties that had arisen on account of increased prices. The railway company was seeking to obtain a raise of fare from six to seven cents. That proceeding involved a careful study of the relation of security investment to rates of return, and he testified before the Board of Arbitration on that subject. He was engaged by the City of Scranton, Pa., in 1918, to represent it before the Pennsylvania Public Service Commission in a rate proceeding. That was a temporary proceeding. He made an examination of the company's books and a determination, as closely as possible, of the actual cost to the company of the property, and testified before the commission on that basis. Later on the commission ordered a present-day inventory and valuation, but the City did not want to spend any more money, so they did not call him in, except in connection with an examination of the company's witnesses for a short time. He also represented the City of Scranton in a gas case. In 1919 he represented the City of Kalamazoo, Michigan, making a study and analysis of the cost of service to the Michigan Railway Company, and he made a report on public policy. He was then retained by the City to represent it in hearings before the Michigan Public Utilities Commission, a valuation having been made in the meantime by the commission itself. He did not make an independent valuation at Kalamazoo, but analyzed the Cooley valuation submitted on behalf of the company, and also to some extent the State Commission's valuation.

In 1921 he was selected by the City of Minneapolis to make a valuation of the Minneapolis Street Railway property and an investigation of its books and records, and to represent the City before the Railroad and Warehouse Commission of that state in a proceeding instituted by the company for a temporary increase of fares. He made a complete inventory of the property of that company and a valuation on the basis of normal reproduction cost, together with an analysis of the company's books and records referring to actual costs, operating expenses and everything relating to them. In 1921 he was retained by the City of Springfield, Illinois, as its representative on the Board of Arbitration to determine the value of the properties of the Springfield Gas and Electric Company. He sat as a member of that Board of Arbitration and an inventory and appraisal was submitted to the board by the experts representing the City and the company respectively. He has written a two-volume work on Municipal Franchises. He has been connected with the National Municipal League for about 15 years and was chairman of its Committee on Franchises. His work in that connection was to keep track of franchise development, primarily in relation to public policies and the making of reports from time to time, as well as reading papers before the National Conferences of the League in relation to franchise policies. Most of that work had to do with street railways.

In 1920, shortly after the street car strike in Denver, certain parties in Denver asked the witness to take certain documents which they submitted to him relating to the valuation of the Denver Tramway Company's properties and make a report thereon. He did not come to Denver in connection with that matter, had never seen the property, except when here on one occasion he had ridden on the cars; but he made a report, printed and published it broadcast and attached it to his volume entitled "Analysis of the Electric Railway Problem," as an appendix, stating among other things: "I think that a fair valuation of the entire Tramway property, with deductions for accrued depreciation, would be not more than $14,000,000 or $15,000,000." The substance of all that the witness said on his examination in chief as to his qualifications as an expert has been stated substantially in the language of the witness himself. Then, on cross-examination, he said that aside from this case and the one in Minneapolis he had never attempted an ascertainment of unit costs for the whole of a street railway system; that in the Scranton case he checked a

reconstruction-cost valuation that had been made for the company but did not make an independent valuation himself; that as arbitrator in the Springfield case he studied the valuations presented to the board, and, of course, made none himself; that he was not engaged by the City of Kalamazoo to make an independent inventory and valuation of the street railway there but to make an additional accounting study and look over the property with respect to depreciation and check up the inventory and valuation made by the engineers for the Michigan Public Utilities Commission; that in that case he appeared before the commission and gave testimony on the results of his accounting studies, assisted counsel in cross-examination and prepared exhibits derived in part from the appraisals that had been made; that as to the street railway lines of New York City and his engagement there he did not do anything further than an analysis of the appraisal which had been made under the plan which was submitted by the Transit Commission, his work was principally on the accounting end and general advice on valuation principles; that in the New Jersey case all his work was with reference to the preparation of the defense in that case of the municipalities on the presentation of the case before the commission, but he did not participate in the subsequent proceedings before the master in the Federal Court in that case at all; that he was not an engineer either in a technical or a practical sense and had never been employed by any street railway in any capacity whatsoever; that he had never had any experience whatsoever in operating a street railway and that outside of his work in the Minneapolis-St. Paul case and this case he had never valued a street railway company for rate-making purposes by making a detailed exhaustive inventory and applying thereto unit costs as a basis of valuation; that he had never been engaged in financing or constructing a street railway or any other public utility privately owned, but that as an employé of the New York Public Service Commission he did assist the commission in planning and construction of subways and negotiating of contracts for their operation; that he had never had charge of construction of a street railway or of any part of one.

On the facts stated petitioner's counsel objected to Dr. Wilcox as an expert witness in the case, and later, after he had been permitted to testify, moved that all of his testimony as an expert be stricken, because his competency had not been shown.

[1] When one is called as an expert witness, before he can testify as such it must be shown that he possesses the necessary qualifications,—that on account of special knowledge, skill or experience possessed and enjoyed by him over others his opinion on the subject of inquiry will aid the court or jury to a correct conclusion; hence one so qualified will be permitted to express his personal opinion on the ultimate facts. Rogers on Expert Testimony (2d Ed.) §§ 15–21. Dr. Wilcox admitted that he had no training as an engineer of any kind, that he had had no practical experience with street railways or any other kind of industrial plants, in building them or any part of them, or in ever being in their employ in any capacity. He holds the degree of Doctor of Philosophy and is admittedly a prolific writer on economic and sociological subjects. The uncertainty as to just what he had done in the past and lack of any relation of that service and experience to what he undertook to do in this case is obvious. He studied book accounts to find the cost of properties, examined valuations made by others, studied city governments and franchises in reference to utilities, routings and policies. That experience related to subjects foreign to the inquiry before the master. The nearest approach was what he did in New York City, in the New Jersey electric railway case, and at Scranton, Pa. As to the first, he says that he assisted the New York Public Service Commission in planning and construction of subways and negotiating of contracts for their operation, but he added that he had never had charge of the construction of a street railway, and it is uncertain as to just what he did while with the Public Service Commission. The same thing is true as to his services when he was deputy commissioner of the Department of Water Supply. In that connection he said he had engineers who prepared plans for a subway system. He did not prepare them. He does not say he could have prepared them. It does not appear that he had anything to do with construction. He said that construction work was still going on; that he was not a subway engineer and he did not have charge, only that the planning and negotiation of the contract for the construction work was done while he was with the commission.

[2] Counsel for the receiver has shown, in connection with the New Jersey railway and Scranton cases, that what he did in those cases, and all he did, was to examine the books of the companies, from which he claimed to ascertain what the witness calls Normal Reproduction Cost of those properties. The New Jersey case passed from the

commission into the courts, and it does not appear that Dr. Wilcox was called there. He was also with the Federal Electric Railways Commission in 1920, and as one of his qualifications he testified that he was engaged to analyze the record and the testimony that had been taken by that commission. He admitted that he did not make the analysis but instead wrote a book containing over 700 pages, which he entitled, "Analysis of the Electric Railway Problem," and presented that to the commission as his report. The commission refused to publish it. He published it himself. I think it clear beyond question that there was a total failure to qualify this witness as an expert and that it was error in matter of law to permit him to testify as an expert. Stillwell Mfg. Co. v. Phelps, 130 U. S. 520, 527, 9 S. Ct. 601, 32 L. Ed. 1035; Rogers on Expert Testimony; Dole v. Johnson, 50 N. H. 452; Missouri Pacific v. Finley, 38 Kan. 550, 16 P. 951; People v. Millard, 53 Mich. 63, 18 N. W. 562; Kilbourne v. Jennings, 38 Iowa, 533; People v. Rice, 159 N. Y. 400, 54 N. E. 48; Florida East Coast Ry. Co. v. Lassiter, 59 Fla. 246, 52 So. 975; Douglass & Varnum v. Morrisville, 89 Vt. 393, 95 A. 810; State v. Flanigan, 111 Md. 481, 74 A. 818; Arminius Chemical Co. v. Landrum, 113 Va. 7, 73 S. E. 459, 38 L. R. A. (N. S.) 272, Ann. Cas. 1913D, 1075; Flemister v. Power Co., 140 Ga. 511, 79 S. E. 148.

Thereafter the master permitted Dr. Wilcox to testify at great length in advocacy of his normal or historical reproduction cost theory and to submit many voluminous exhibits which he had made up in support of that theory. What he calls Normal Reproduction Cost is the original cost of installation of the present existing plant and its different parts. He went to the books to find that out, but it is true, as the master says, that "he found that the books of the company and its predecessors made it impossible to determine the actual investment, and his method, as he applied it, allowed him much latitude in determining whether expenditures were abnormal or imprudent. He also gave himself freedom in the adoption of his unit costs, and in determining, according to his judgment, what property he should exclude from the total which he valued." He did not confine himself to property of the company used and useful in its system, but he assumed to exercise his judgment in determining what property was necessary for the system. In applying his normal or historical reproduction cost he took the date of acquisition or construction, if ascertainable, of each major unit of property and applied to it what he considered a fair and reasonable cost at the time of its installation. He utterly repudiated as a vagary leading to absurd results reproduction cost new as of the present day, less depreciation, as of any aid or assistance in valuing the property, and said that such a method "would not be undertaken at the present time except in the imagination of an appraiser not required to submit his valuation to any practical test," that it was a barren formula theoretically unsound and leading to absurd practical results, that he had access to the Tramway Company's vouchers other than payrolls as far back as 1899, although a few of them could not be located, and that the payrolls are available back to 1913. He applied prices paid for lands on which the company had erected buildings, although purchased many years before, and gave no consideration to the increased value thereof. Where he could ascertain those prices from the company's books he took them; where he could not he took what he considered their normal cost at dates of acquisition. As to buildings he applied the material and labor costs at the time of construction, as he ascertained them by the exercise of his judgment. On classifications, the cost of which could not be ascertained from the books at times of installation, he exercised his judgment in making up unit costs for like expenditures at the present day and then carried those back by calculations, which he considered reasonable, to the time of the particular installation.

[3] Pursuing thus his method he found the normal reproduction cost of the system to be $12,051,000 plus, and applying to that his straight-line use-life formula for depreciation brought the valuation of the system within the City down to $7,215,000 plus. By his straight-line use-life formula he assumed 22 years for track and 25 years for cars, and different years for different character and kind of buildings, and applied them regardless of the actual condition of the property. In so far as he testified as to what the books of the Tramway Company or predecessor companies disclosed as to cost of property when installed, he was competent. That was not expert testimony. And if the cost of all property in existence at the time of this appraisement had been shown by the books its materiality, along with other evidence, in ascertaining a fair value would not be doubted. But in large part they do not show that cost, and the witness in making up his so-called normal or historical valuation resorted to methods requiring the use of his judgment, and as to that I think he

had not been shown competent to speak. His nonexpert testimony is so modified, enlarged or restricted by his personal opinion as to render the two inseparable, and each is valueless.

Before the taking of testimony by the master was closed Dr. Wilcox brought in an exhibit placing a valuation on the property at its reproduction cost new less depreciation, based on prices not of December 31, 1922, when the inventory for appraisement was closed, but on prices which he said were fairly representative of the year 1922, giving a gross valuation of $16,997,000 plus, from which, after deducting depreciation on his straight-line method, there was left a value of $9,356,000 plus. He did that, he said, in deference to the ruling of the United States Supreme Court, to the effect that present labor and material costs should be considered among other factors. The master said: "The depreciation contended for by the City is excessively large, and I find it to be entirely at variance with the facts. It would disclose a condition tending rapidly to dilapidation. The evidence and my own inspection are to the contrary. The system is now well maintained in resisting the ravages of depreciation."

Both of these valuations were of the system after Dr. Wilcox had exercised his judgment in excluding from the inventory property which he considered not used, useful or reasonably necessary. In them he refused to allow anything for working capital or going concern value. He had with him a corp of assistants, some of whom are admittedly competent men in their lines, particularly an electrical engineer who went thoroughly over the power plant and the electrical distribution system. He gave no testimony on values. On cross-examination that witness said: "In many cases I made conclusions and told him (Dr. Wilcox) what my conclusions were. Then he, from my conclusions and a personal study made by himself, would arrive at his conclusions, which sometimes did and sometimes did not coincide with my conclusion. Q. And which conclusion was adopted in such a case as that? A. Dr. Wilcox's conclusion." When the master came to consider the earnings and the rate of return, he said of the appraisements made for the City that they had improperly excluded from the inventory hundreds of thousands of dollars of value of physical property, that the unit costs used therein were too low, that the second or higher valuation (made by Dr. Wilcox) showed an increase over the first of approximately 40 per cent., whereas under the evidence that factor of increase was too small to give credit to changed conditions.

Enough has been said to indicate my reasons for taking the record in this way: Two thoroughly competent, trained and experienced engineers, acquainted with every phase of street railway construction, operation, maintenance and valuation valued the system on reproduction cost new basis as of December 31, 1922, at $26,000,000 plus and $27,000,000 plus, exclusive of cost of financing and going concern value; no witness shown to have been trained, experienced, skilled and competent in such matters made a valuation in behalf of the City; in 1918 the State Utilities Commission, after a full hearing placed a valuation on the plant within the City, including going concern value, of more than $20,000,000, based on prices for a series of years extending back of the year 1918; thereafter the mayor's Committee of 55 employed Prof. Ketchum, Dean of the Department of Engineering of the Colorado State University, a trained engineer, and he after many months examination and study of the record presented before the State Utilities Commission approved the valuation of the commission on the basis of prices used. The record further shows that prices of material and labor costs on December 31, 1922, at the time the inventory was closed on which to make a valuation, were approximately 50 per cent. more than the bases used by the State Utilities Commission and Dean Ketchum. The valuation made by the master is lower than their valuations. More than $3,000,000 has been spent upon the physical plant since January, 1918, a large part of that sum going for replacements and betterments. More that 35 miles of old track has been replaced with new, new cars have been purchased or constructed and old ones torn down and remodeled. Over $350,000 has been expended for new power plant equipment and its installation; and while this addition to the power plant did not go into the inventory and is not in the appraisement because installed after December 31, 1922, nevertheless it was considered by the City as a reason for its insistence that some of the older machinery should be excluded from the inventory. These expenditures for improvement of the plant have been made under the receiver, and were possible only because defaulted interest on mortgage bonds was thus applied. The plant is and was at the time of the hearing before the master in excellent physical condition, it is well and efficiently managed and renders up-to-date service.

[4] At the time the receiver's exceptions

came on for argument, July, 1924, other proof brought down to that date was introduced showing that there had been no recession in price and labor costs below those applied by Woy and Drum in their appraisals; but that the slight changes that had occurred had been advances rather than recessions, as applied to the materials and supplies making up and used in the operation of the plant. Ordinarily, reproduction cost new less depreciation is the dominant factor in a present-valuation inquiry. S. W. Bell Tele. Co. v. Pub. Serv. Comm., 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Bluefield Co. v. Pub. Serv. Comm., 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176; Monroe Gaslight & Fuel Co. v. Mich. Pub. Util. Comm. (D. C.) 292 F. 139; Van Wert Gaslight Co. v. Pub. Util. Comm. (D. C.) 299 F. 670. Of necessity that must be the rule in this case, because there is no other data on the subject, aside from the fact that the base prices used by Woy and Drum were about 50 per cent. higher than pre-war prices. A very considerable part of the property making up the plant on December 31, 1922, had been installed under war prices. Thus in view of the whole record I cannot escape the conclusion that the master, in making up his values of some of the classifications of property, has stated those values too low and that there should be substantial increases. I may add that the City filed no exceptions to the master's report, but was content to renew its objection to the jurisdiction of the court and confined itself to that contention. Counsel for the receiver argued his exceptions fully and exhaustively, including the challenge of the competency of Dr. Wilcox as an expert witness, as well as the exceptions that the valuations of the master were too low; and although counsel for the City was present and heard that argument, no argument whatever was made for the City on either subject.

The master made up his report and stated his values according to the classifications of property made by Drum. Counsel for the receiver, in presenting his argument, not only followed the master in that respect but compared the valuations of Drum to those of the master, for the purpose of showing that the latter was too low, relying upon Woy only for the purpose of establishing that Drum was not too high. I will follow that course, and for that purpose set out in parallel columns the master's figures as compared with Drum's, noting the difference between them only as to such classifications on which I think the master's figures should be increased.

| | | Master. | Drum. | Difference. |
|---|---|---|---|---|
| 1. | Land and right of way | $1,042,695 | $1,333,456 | $ |
| 2. | Track | 4,896,176 | 5,347,255 | $451,079 |
| 3. | Bridges etc. (a) | 25,711 | | |
| | " (b) | 785,252 | 856,231 | |
| 4. | Paving | 1,273,044 | 1,412,005 | 138,961 |
| 5. | Electrical distribution system | 999,347 | 1,109,285 | 109,938 |
| 6. | Rolling stock | 3,951,283 | 4,445,233 | 493,950 |
| 7. | Power station equipment | 1,411,520 | 1,598,098 | 186,578 |
| 8. | Substation equipment | 249,412 | 303,156 | |
| 9. | Shop equipment tools, etc. | 362,072 | 391,514 | 29,442 |
| 10. | Buildings | 2,356,000 | 2,950,023 | |
| 11. | Furniture and fixtures | 144,918 | 174,716 | |
| 12. | General stores | 425,000 | 507,599 | 82,599 |
| 13. | Working capital | 200,000 | 239,394 | 39,394 |
| 14. | Franchise cost | 100,000 | 284,100 | |
| 15. | Engineering and superintendence | 776,228 | 1,035,634 | 259,406 |
| 16. | Administration, etc. | 500,000 | 953,010 | 453,010 |
| 17. | Taxes during construction | 275,000 | 325,220 | 50,220 |
| 18. | Interest during construction | 1,664,889 | 2,763,184 | |
| | | $21,438,547 | $28,029,113 | |

I think the differences noted above in shop equipment, general stores, working capital and taxes should all be allowed; that 75 per cent. of the differences in Classifications 15 and 16 should be allowed; and that 50 per cent. of the remaining differences shown should be allowed. As to the differences in other classifications not carried out in the last column, it is sufficient to say that I am not convinced that the master's allowances should be increased. The different classifications, then, would have values in accordance with this finding as follows:

| | | |
|---|---|---|
| 1. | Land and right of way | $ 1,042,695 |
| 2. | Track | 5,121,715 |
| 3. | Bridges | 810,963 |
| 4. | Paving | 1,342,524 |
| 5. | Electrical distribution system | 1,054,316 |
| 6. | Rolling stock | 4,198,258 |
| 7. | Power station equipment | 1,504,809 |
| 8. | Substation equipment | 249,412 |
| 9. | Shop equipment | 391,514 |
| 10. | Buildings | 2,356,000 |
| 11. | Furniture and fixtures | 144,918 |
| 12. | General stores | 507,599 |
| 13. | Working capital | 239,394 |
| 14. | Franchise cost | 100,000 |
| 15. | Engineering and superintendence | 970,783 |
| 16. | Administration, organization, etc. | 839,760 |
| 17. | Taxes during construction | 325,220 |
| 18. | Interest during construction | 1,664,889 |
| | Total | $22,864,769 |

[5] The master, in discussing Classification 1, Land and Right of Way, names the excluded tracts, and, of course, the values placed on the buildings on the excluded tracts were deducted from Classification 10. But the master does not specify any excluded property under the other classifications. He only says in general terms, that he excludes such items as in his judgment ought not to be included. My examination of the record convinces that the remaining 50 per cent. of differences noted, will cover proper exclusions and claimed or supposed excesses in overheads. Furthermore, Drum's valuation, on which the comparison has been made, is considerably more than $1,000,000 under Woy. It is true they are both expert witnesses, not in exact accord one with the other, and the testimony of each, while based on facts stated, was in large part expression of opinion, which under the law need not be literally followed. But the opinion of each was a mature and enlightened judgment of a man who had given the subject long study and reflection, and whose continuous practical experience for many years had informed him on every phase of the inquiry. Such testimony ought not to be lightly weighed. The subject-matter of inquiry is so unusual that the common every-day knowledge of judges or jurors would not be of much help.

The exceptions have taken me over a field much more familiar in detail to the master than it can be to me, even after six weeks' diligent study, which would have lengthened into months without the master's assistance. But in such a situation my independent judgment on the questions thus raised cannot be withheld; and it seems plain to me that the receiver is entitled to the additional relief stated for the reasons stated, to the benefit of the estate which he represents.

[6] Accrued depreciation is a fact to be ascertained by inspection. Drum found it to be $2,516,000 plus on December 31, 1922, and Woy $2,022,000. Each said it was not a question of per cent. I think a fair amount to deduct under the proof for that purpose is $2,250,000. I see no reason to change the master's allowance of $450,000 for Annual Depreciation Reserve, as this is subject to correction from time to time in the light of experience.

[7] There remains to be added an amount for going concern value. On this subject the City declined to offer any proof. The lowest amount named by a witness for the receiver was $2,900,000, and the highest $4,500,000. The master allowed $1,500,000.

The receiver says he does not know where the master got this amount, and there is no evidence to support it. The question thus raised is not without difficulty. I confess I have no personal opinion or judgment at all on the subject; every-day knowledge of ordinary affairs does not inform me and is no guide. The witnesses who testified for the receiver on the subject were Woy, Drum and the receiver himself, who is a graduate engineer. He practiced his profession for about 15 years after graduation in 1886. Thereafter he was employed in the operating department of different railroads, and has had experience in every phase of railroad work from construction on up to operation. He has been General Manager of the St. Joseph & Grand Island and General Superintendent of the Union Pacific. During the World War he had charge of operation of the French railroads for ten months and had about 7,000 men under him in railroad transportation service there. His experience prior to accepting appointment as receiver in this case had been with steam railways. I am firmly of the notion that each of these witnesses knew much more about what it would probably cost to put a skeleton street railway plant in successful operation than I do. I know nothing on the subject. I am sure they each knew a great deal; and I see no escape from accepting the lowest amount named in the testimony, which added, brings the valuation of the plant to $23,514,769.

Counsel for the receiver asked the master to value the street easements belonging to the Tramway Company and make that value a part of the rate base. The receiver alleged in his petition that the company owned, as assignee, the rights granted to the Denver Electric & Cable Railway Company, its successors and assigns, by City Ordinance No. 3 of 1885, and the rights granted to the Denver City Cable Railway Company, its successors and assigns, by City Ordinance No. 36 of 1888. The answer of the City does not deny that the Tramway Company is the remote assignee of both of those companies, and the proof shows that it is. Section 1 of Ordinance No. 3 of 1885 is this:

"That the right of way be, and the same is hereby granted to the Denver Electric & Cable Railway Company, its successors and assigns, to build, operate and maintain a single or double track railway, with switches, turnouts, side tracks and other appliances necessary for the operation of the same, in, along and across the streets of the City of Denver, said railway to be op-

erated by power transmitted by use of electricity or by cable."

And Section 1 of Ordinance No. 36 of 1888 is this:

"That the right of way be, and the same is hereby granted to the Denver City Cable Railway Company, a corporation organized and existing under and by virtue of the laws of the State of Colorado, and to its successors and assigns, to build, equip, maintain, own and operate a single or double track or cable railway, with switches, turnouts, side tracks, and other appliances necessary for the operation of the same, in, along and across all the streets, avenues, viaducts and bridges of the City of Denver, save and excepting Fifteenth Street for its entire length, Colfax Avenue from and including its intersection with Fifteenth Street eastward to the eastern corporate limits of the City, and Broadway from and including the intersection of Colfax Avenue to the southern City limits."

[8] The receiver claims that each of these ordinances granted a perpetual right and easement in the streets to construct, maintain and operate street-car lines. The City's answer denies that such rights were granted, but it does not pretend to define the rights that were granted by either ordinance, nor the limitations that should be put upon them—whether they were revocable licenses or for a term of years. Its position, disclosed by its answer and argument of counsel before the master, seems to be that all easement rights in the streets will expire in 1926, because the Tramway Company's immediate assignor accepted the ordinance of May 15, 1906, which limited the rights which it purported to grant to a term of twenty years. Obviously no valuation could be put on the easements now owned by the Tramway Company without first ascertaining their duration, whether they are for years, or mere revocable licenses, or in perpetuity. The master was of the opinion, on the cases which he cited, that the value of street easements could not be brought into the rate base, so he expressed no opinion on valuation. No one doubts that the easements, whatever their duration or terms may be, are property, and property of value, and that they inhere in and are indispensable to the other property rights of the company. They lie in grants and are the foundation of all other rights. They are of such import, both to the company and the public, that, having been put in issue, I think their duration and value should be now adjudicated, though it be finally held, as the master held, that their value cannot be brought into the rate base. Public rights in the use of a public utility cannot be detrimentally affected by the duration of the grant, where, as here, it is not exclusive and monopolistic. If affected at all, permanency would rather be to public advantage.

[9, 10] The City possesses at all times the police power to regulate the amount of fares to be charged and the character of service to be rendered, so long as those regulations provide a fair return on capital investment and its preservation unimpaired. Knoxville v. Water Co., 212 U. S. 1, 13, 29 S. Ct. 148, 53 L. Ed. 371. To allow the public utility less is confiscation, in violation of constitutional guaranties. Those are the inviolable conditions on which the Tramway Company's property was dedicated to public use, and they are the simplest principles of justice and common honesty; for otherwise the public, if so minded, would be at liberty to gradually consume and appropriate to its own benefit the whole property. The question presented by the parties seems thus free from any chance of practical disadvantage to the grantor. The terms used in both ordinances 1885 and 1888 are appropriate to grants in perpetuity. There are no express limitations and no language is used from which an implication can arise that a less estate was intended than the general terms signify. The nature of the transaction, its purpose, its permanent character, and the investment required of the grantees repel an intention by either grantor or grantee that they were revocable licenses or easements at the will of the grantor, nor can any expression be found in either ordinance supporting a claim that the rights granted were to be for a term of years.

This question was presented here and considered in February, 1908, in Mercantile Trust Co. v. City of Denver (C. C.) 161 F. 769, which had been pending for several years, as to the Ordinance of 1885. There was hesitation, if not doubt, and the court concluded that a decision upon the question presented was not necessary. That case was appealed (201 F. 790, 120 C. C. A. 100), and I venture to say the point was left undecided. All the Circuit Court of Appeals did was to leave the question open until May, 1926, the end of the 20-year term of the Ordinance of 1906, rather than until 1935, as held by this court; but that court repudiated the contention that rights given by the Ordinance of 1885 would not extend beyond May, 1926, though it did not undertake to say what those rights would be. It

did hold, tentatively, that the claimed rights in perpetuity might be well founded as to some of the streets, dependent upon matters in pais; but it then said that even that was dependent on a proper construction of the ordinance as to the duration of the franchise, and it expressly refrained from passing upon the scope of the grant. A proper estimate of that opinion, as shown on the face of it, cannot be had without considering what the court had said in Omaha Electric Light & Power Co. v. City of Omaha, 179 F. 455, 102 C. C. A. 601, and the fact that the Omaha Case was then pending in the Supreme Court on appeal. Since then it has been authoritatively settled, I think, that Ordinances No. 3 of 1885 and No. 36 of 1888 granted street easements in perpetuity. Old Colony Trust Co. v. Omaha, 230 U. S. 100, 33 S. Ct. 967, 57 L. Ed. 1410; Omaha Electric Light & Power Co. v. City of Omaha, 216 F. 848, 133 C. C. A. 52; City of Owensboro v. Cumberland Tel. & Tel. Co., 230 U. S. 58, 33 S. Ct. 988, 57 L. Ed. 1389; Northern Ohio Traction & Light Co. v. Ohio, 245 U. S. 574, 38 S. Ct. 196, 62 L. Ed. 481, L. R. A. 1918E, 865; Covington v. South Covington Street Ry. Co., 246 U. S. 413, 38 S. Ct. 376, 62 L. Ed. 802. See also Louisville v. Cumberland Tel. Co., 224 U. S. 649, 32 S. Ct. 572, 56 L. Ed. 934; N. Y. Electric Lines v. Empire City Subway, 235 U. S. 179, 35 S. Ct. 72, 59 L. Ed. 184, L. R. A. 1918E, 874, Ann. Cas. 1915A, 906.

[11] But the City relies upon Toll Road Co. v. People ex rel., 22 Colo. 429, 45 P. 398, 37 L. R. A. 711, and Leadville v. Sewer Co., 47 Colo. 118, 107 P. 801, as establishing a contrary rule here, because, as claimed by counsel, they give a construction to the Colorado Constitution which prohibits a grant of street easements in perpetuity. Section 11, article 2, of the Colorado Constitution says:

"That no ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly."

This is, in substance, equivalent to Section 15, Article 3, of the Constitution of Nebraska, noted in the Old Colony Trust Co. Case in 230 U. S., supra. The case in 22 Colo., supra, was a suit in the nature of quo warranto, asking that the Toll Road Company be excluded from the exercise of its assumed franchise to collect tolls. The facts, gathered from an introductory state-

ment and the opinion itself, were these: The Virginia Canon Wagon Road Company was incorporated in December, 1865, under Territorial Act of March 11, 1864 (Laws Colo. p. 57), to construct and operate a toll road. The Act gave it a corporate life of twenty years, and there was no provision for its renewal at the end of that time. It constructed the road, maintained and operated it, as a toll road and collected tolls, as the Act prescribed, until October, 1881. Plaintiff in error, the Virginia Canon Toll-Road Company, was incorporated in October, 1881, under the Act of March 14, 1877 (Gen. Laws, § 270). It was not incorporated under the law applicable to toll-road companies, which granted the right to exact tolls only to companies organized to construct toll roads. It took over the road from the Wagon Road Company and received tolls until the latter's corporate life expired; whereupon suit was brought against the Toll-Road Company, challenging its right to further collect tolls. The court held that the toll·road was dedicated by its owner as a public highway, and that the only right the Wagon Road Company had was to collect tolls during its corporate life. As evidence that that was the legislative intent it called attention to the fact that there was no provision for the renewal of the corporate life of toll-road companies, nor for the transfer of their franchises to another corporation; whereas life insurance companies organized under the statutes of Colorado are given perpetual succession, railroad companies under the statute (and the Denver Tramway Company and all of its predecessor assignors were so organized) continue to exercise their franchises for a period of 50 years, with provision for their renewal, ditch and reservoir companies may have their terms of incorporation continued and extended for 20 years beyond the original term; but there was no provision of any kind for the renewal of the corporate existence of a toll-road company; and this the court said was another indication of the legislative intent not to allow such companies themselves or by their grantees to exercise this sovereign power of charging tolls beyond the original term of 20 years,—in effect a legislative declaration that the power to continue the exercise of such franchise ceases when the corporate existence ceases.

It was said that the plaintiff in error was organized under the Act relating to corporations in general, or ordinary business or trading companies, that it was not organized to construct a toll road and did not construct a toll road, but to purchase and

operate one that had already been constructed, that it did not come within the purposes of the Toll-Road Act and did not acquire the rights of such a company, that the franchise of the original company to collect tolls had expired and that the latter company had no such franchise. The court said the payment of tolls by the public for use of the road was in lieu of taxes for its construction and maintenance. The court did say, and that is the part of the opinion relied upon by counsel for the City, that to permit the plaintiff in error to exercise the franchise of collecting tolls would be an indirect evasion of the provisions of Section 11, Article 2, of the Constitution, in that on the expiration of the corporate life of each company a new company could be organized to take over the road and thus continue the exercise of the franchise of charging tolls. But it is obvious that the court disposed of the contention of plaintiff in error on the ground already stated. It seems also apparent that the right to take tolls for the use of a public highway by the public, except on the conditions and terms stated by the court and impliedly arising on the toll-road statute, would be a "special privilege, franchise or immunity" without any consideration to the public and in derogation of public right, of which no one could be possessed and enjoy by legislative grant or otherwise, even for a day. And it was said if plaintiff in error had that right it got it either as a result of a purchase from the Wagon Road Company in connection with a purchase of the latter's tangible property, or as a necessary incident to its own organization as a corporation, neither contention, the court said, being tenable. The easements granted by the Ordinances of 1885 and 1888 were in furtherance of public right in the use of public highways, affording a needed and convenient mode of travel to the public, as an aid and not an obstruction to public use of the streets.

The underlying principle which distinguishes that case from this, and the inapplicability of the constitutional provision here, seems plain. The case in 47 Colo. 118, is of even less relevancy. That was a controversy between the City of Leadville and owners of a privately constructed sewer in the streets of Leadville, and the question was, whether they had a right to make excavation in the streets for the purpose of cleaning the sewer and disconnecting from it users who would not pay charges for its use, without permits from and supervision by city authorities. Their original right to con-

struct the sewer was obtained on motion when their petition for that purpose was presented to the city council. The motion was adopted on condition that the work be prosecuted under direction of the committee on streets; and thereafter permits for extensions were similarly obtained. It is said in the opinion: "No ordinance was passed granting or attempting to grant to the appellee any franchise, and the only right it had (if any), for its use of the streets and alleys was secured through the permits." There were five separate opinions in the case, and consequent disagreement and uncertainty as to just what were the rights of the sewer company.

[12] But it is argued that perpetual easements in the streets if granted by the Ordinances of 1885 and 1888, were surrendered or cut down to a term of 20 years when the Tramway Company's immediate predecessor and assignor accepted the ordinance of May 15, 1906. That ordinance was passed when the controversy in the Mercantile Trust Company Case, 161 F., supra, was pending and had been pending for several years. The street car company was contending that it had perpetual rights in the streets. This was denied by the city officials and permits for excavations for construction of extensions had been refused. Extensions of street-car lines were needed and the street car company stood ready to make them, and had laid its plans to make them long before the Ordinance of May 15, 1906, was passed. Under those conditions the Ordinance of May 15, 1906, applicable only to extensions on specified streets, which the street-car company had theretofore planned to make, was passed and accepted. But in that ordinance the claimed rights of the street-car company, the Denver Tramway Company's immediate assignor, under the prior ordinance, were set out and asserted to exist without further grants from the City, and Section 11 thereof provides:

"Neither this franchise or grant of any provision herein, or the proposal thereof, shall be a waiver of any right, claim, grant, license or franchise or right of way belonging to or claimed to belong to The Denver City Tramway Company, or any of its assignor, predecessor or consolidating companies, nor shall this franchise in any manner be considered as a waiver in any way of any litigation or contention, by either the City and County of Denver or the Denver City Tramway Company, or any of its predecessor or constituent companies, to the prejudice of either party, as to the validity,

scope or duration of any franchise, grant or right of way, but the rights of both parties and their positions and contentions in any and all litigation, and concerning such ordinances, franchises, grants, licenses and rights of way, shall remain entirely unaffected by this ordinance."

Plainly, the passage and acceptance of this ordinance in no way restricted or affected the rights of the Tramway Company which it had under the Ordinances of 1885 and 1888. They were all expressly reserved to it, and in my judgment the perpetual easements granted by those two ordinances, now held under assignment by the Denver Tramway Company, remain unaffected by the Ordinance of May 15, 1906.

[13] On the proof offered by the receiver, and there is none to the contrary, I find the value of those easements to be $2,000,000. But I agree with the master that their value cannot enter into the rate base. Georgia Ry. & Power Co. v. R. R. Comm., 262 U. S. 625, 632, 43 S. Ct. 680, 67 L. Ed. 1144; City of Minneapolis v. Rand (C. C. A.) 285 F. 818.

[14] The receiver in his petition asks for an order of court permitting him to renounce the Ordinance of May 15, 1906, and the obligations which it purports to impose upon the Tramway Company. Section 2 of that ordinance provides that one of the considerations for its passage and acceptance was that the Tramway Company would pay to the City and County of Denver the sum of $1,200,000 in monthly installments of $5,000 each during the life of that franchise, in lieu of any car licenses then or during the life of the franchise to be assessed or charged by the City, the payments to be kept in a special fund and applied to the establishment, improvement and maintenance of streets, boulevards and parks of the City. The Court of Appeals, in City and County of Denver v. Stenger, 295 F. 809, held that this created a binding obligation on the Tramway Company, based on mutual consideration, to make all installment payments. So far the contract in that respect has been mutually performed, and I do not think the receiver and the company can now escape the obligation to pay the remaining installments. There are still seventeen months before the twenty-year term named in that ordinance shall have expired. In that case, however, rights granted by the Ordinances of 1885 and 1888 were not considered and determined. An order of renunciation will be denied.

The report and findings of the special master are in all respects approved, except as hereinbefore otherwise indicated.

For the purposes of Equity Rule 67, exceptions to the master's report, numbered first, eighth, tenth, twelfth, seventeenth, nineteenth, twentieth, twenty-third, twenty-seventh, twenty-eighth, twenty-ninth, thirty-second and thirty-sixth are overruled, and the remaining twenty-four exceptions are sustained.

The motion of the City, filed on July 15, 1924, attacking the jurisdiction of the court, is overruled.

The master is allowed, in addition to the sums heretofore paid to him on account, the sum of $7,500, in full for his services.

On consideration of the whole record and the conclusions reached, two-thirds of the taxable costs, including the master's fees and stenographer's fees, will be adjudged against the City, and the remaining third against the receiver.

Counsel may prepare a decree in keeping with the findings and rulings herein made.